```
 1                    UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3     _____
                                   )
 4     UNITED STATES OF AMERICA,    ) CR20-00215-RSM
                                    )
 5                    Plaintiff,    ) SEATTLE, WASHINGTON
                                    )
 6     v.                           ) September 7, 2021 -
                                    ) 9:00 A.M.
 7     ELLEN BRENNAN REICHE,        )
                                    )
 8                    Defendant.    ) JURY TRIAL - DAY 1
                                    )
 9     _____ )

10     _____

                    VERBATIM REPORT OF PROCEEDINGS
11            BEFORE THE HONORABLE RICARDO S. MARTINEZ
                    UNITED STATES DISTRICT JUDGE
12     _____

13

14     APPEARANCES:

15       For the Plaintiff:       Philip Kopczynski
                                   Sok Tea Jiang
16                                 U.S. Attorney's Office
                                   700 Stewart Street
17                                 Suite 5220
                                   Seattle, WA  98101
18

19       For the Defendant:       Jesse G. Cantor
                                   Christopher Sanders
20                                 Federal Public Defender's Office
                                   1601 5th Avenue. Suite 700
21                                 Westlake Center Office Tower
                                   Seattle, WA  98101
22

23

24

25
```

**Proceedings stenographically reported and transcript produced with computer-aided technology**

```
1                          EXAMINATION INDEX

2

3     EXAMINATION OF                                        PAGE

4     TYLER D. NIES        DIRECT EXAMINATION               42
                           BY MS. JIANG
5                          CROSS-EXAMINATION                59
                           BY MR. CANTOR
6                          REDIRECT EXAMINATION             83
                           BY MS. JIANG
7     ERIC SHAFFSTALL      DIRECT EXAMINATION               85
                           BY MR. KOPCZYNSKI
8

9

10

11                          EXHIBIT INDEX

12

13    EXHIBITS ADMITTED                                     PAGE

      Exhibit No. 12, pgs. 12-14 and 17-22;
14    Exhibit No. 24;
      Exhibit No. 26, pgs. 3-4, 8, 17, 25, 27, 30-32, and
15    35;
      Exhibit Nos. 32, 33, 34, 35, and 36               41
16    Exhibit No. 12, page 16                           50
      Exhibit No. 12, page 11                           57
17    Exhibit No. 12, page 15                           58

18

19

20

21

22

23

24

25
```

 1          (The following occurred in the presence of the venire.)

 2          THE COURT:  Good morning.  Please be seated.

 3          THE CLERK:  We're here on the matter of the United

 4   States v. Ellen Brennan Reiche, Case No. CR20-215, assigned to

 5   this Court.

 6       Counsel, will you please make your appearances for the

 7   record?

 8          MR. KOPCZYNSKI:  Good morning, Your Honor.  Philip

 9   Kopczynski for the United States.

10          MS. JIANG:  Good morning, Your Honor.  Sok Tea Jiang for

11   the United States.

12          THE COURT:  Good morning.

13          MR. CANTOR:  Good morning, Your Honor.  Jesse Cantor on

14   behalf of Ellen Reiche.

15          MR. SANDERS:  Good morning, Your Honor.  Christopher

16   Sanders also on behalf of Ms. Reiche.

17          THE COURT:  Counsel, good morning as well.

18       Ladies and gentlemen, good morning to you.  As you have

19   heard, I am Judge Martinez.  You have all been summoned to this

20   courtroom to serve as potential jurors in this particular case.

21       Obviously, because of the ongoing COVID pandemic, we're

22   utilizing different procedures to try to maximize your safety.

23   One of those procedures is not having a lot of people in an even

24   large courtroom such as this at any one period of time.  I

25   believe we brought in approximately 40 jurors for this particular

1    case.  We split you up into two groups, you know, about in half.

2    The other half is in Judge Jones's courtroom, which is the exact

3    mirror image of this courtroom right across the way, and we will

4    do jury selection in this particular way.

5         I must remind counsel that our mics are live.  By that, I

6    mean, not only are we being heard in this courtroom, but

7    everything that is said and spoken into a microphone will also be

8    heard in the other courtroom.

9         We have taken other precautions as well.  As all of you are

10   quite aware, state and local health experts have basically put us

11   back into a mask mandate, and the court, while we're a federal

12   court, we follow the mandates of the local jurisdiction, and they

13   have asked that regardless of vaccination status, that people

14   consider wearing masks when they're in an indoor setting.

15        We also have in this particular case, in this courtroom, we

16   have HEPA filters -- a large air filter here; there's, I think,

17   two more in the back; another one over here by the witness chair

18   as well.  We had all of those filters replaced.  In fact, some of

19   those replacements occurred this morning before you got here.

20   Like I said, we're trying to do everything possible to keep you

21   as safe as possible.  But I must say to you that, on my behalf,

22   I have not had a trial since March of 2020.  In fact, the first

23   week of March 2020.  We closed the courtroom and the courthouse

24   down on March 13th, 2020, and we're slowly trying to get back up

25   in there, but as you can all tell, it's an ongoing battle with

1   the variants, with all the other concerns that are out there.

2       I can't express on the Court's behalf, as Chief Judge and on

3   my own personal behalf as the judge in this particular case, my

4   gratitude to you for your willingness to come in here and help us

5   in this very important process.

6       You know, while we can shut the courthouses down for a little

7   bit of time, we can't shut the court system down.  Constitutional

8   rights are way too important.  And so while we all recognize that

9   there is more risk being involved in this kind of setting, as I

10  said, we're trying to do our absolute best to make sure that you

11  are as safe as possible.

12      In a moment here, I'll tell you a little bit more about the

13  case and stuff, but I'm just really curious, just to begin with:

14  How many of you at any point in the past have been jurors at any

15  level, any case, anywhere at all?  How many of you have gone

16  through the jury selection process?

17      All right.  Yeah.  About four of you out of this group.

18  Thank you.

19      That's not unusual.  We get a lot of first-time jurors here.

20  So welcome to the process.  It's going to be a little bit

21  different than it typically would, but hopefully we will be able

22  to get you in and out of here within too long.

23      I believe all of you have probably been given copies of the

24  juror handbook; you saw the videos presented by our jury staff

25  down below.  And having reviewed those materials, I hope that

1    you're aware that the very first part of any trial involves the

2    selection of a jury.  This is a criminal matter, all right?

3    Under our Constitution, a defendant in a criminal case that's

4    charged by the government, they have the right to have a jury

5    decide what the facts are in any particular case.  And that right

6    to be tried before a jury is maybe even more important because a

7    jury of your peers has to do -- you know, the makeup has to be at

8    least twelve people from the community that know nothing about

9    the case itself.  So the whole process of jury selection is

10   making sure that you are going to be one of those impartial

11   jurors that listens to the case with an open mind and then can

12   decide for yourself in terms of, you know, what you believe the

13   facts are that have been proven.  And you are that prospective

14   panel for this particular case.

15       Just for your knowledge, when you show up downstairs, after

16   you have been summoned in for this case, Jeff or Daisy down

17   there, they randomly put you in this order.  So you are

18   randomized as you are right now.  And I think each one of you has

19   been given a card with a number on it.  That's your number, and

20   that will be your number until you're either selected on the

21   panel or you're excused to go home.

22       And then the process itself is fairly straightforward.  You

23   just saw the attorneys -- the government at the table closest to

24   you; the defense counsel sitting over at the other table.  But in

25   order for this entire process to make sense to you and kind of

1  place it in proper context, you need to know what allegations the

2  government is making against Ms. Reiche in this particular

3  matter.

4      So, in this case, the Grand Jury has returned a document we

5  call an "Indictment."  It's simply a document that informs the

6  defendant of the charges that are being brought by the

7  government.  And in this case, they charged Ms. Reiche with a

8  single count, one count of violence against railroad carriers and

9  attempting to do the same.  Basically, alleging that she impaired

10 the operation of a railroad signal system by placing a wire

11 shunt, a wire connecting the two tracks, across the Burlington

12 Northern Sante Fe Railroad tracks.  And this allegedly occurred

13 in the City of Bellingham up in Whatcom County.

14     So the defendant has denied the charge and has entered a plea

15 of not guilty, as is her right.  That means that it is the

16 government's burden to prove each of the elements of these

17 offenses beyond any reasonable doubt.  The Indictment itself,

18 that document that charges the defendant, is not evidence.  You

19 are not to consider it as such.

20     At the end of the trial, the Court will give you a very

21 specific written set of instructions that set out the elements

22 of each count and what the government's burden is.  So, in

23 effect, you are judges, just like I am.  I judge the law; you

24 judge the facts.  Does that make sense?  You decide what

25 happened.  I decide what law is applicable.  I give you the law

1    and then you connect the facts to the law and in that way decide

2    the case.

3        A very basic example.  An intersection, a car accident,

4    right?  One person says, "I had the green light."  The other

5    person says, "I had the green light."  That fact has to be

6    decided by a jury.  The judge tells you it's against the law to

7    drive through an intersection when you have a red light.  So

8    you're the ones that have to decide which car had the green light

9    and which car had the red light.  It's that straightforward.

10       In order to begin jury selection, all of you must be placed

11   under oath, and then a series of questions will be asked of you,

12   first by me, general questions, and then the attorneys have an

13   opportunity to follow up and ask questions of you.  At the end of

14   that process, then we go through and do the actual selection

15   process.

16       So at this point in time, if I could have every potential

17   juror in the courtroom please rise, raise your right hand, and

18   pay attention to the oath.

19       Madam Clerk.

20           THE CLERK:  Do you and each of you solemnly swear or

21   affirm that the answers you shall give to the questions asked by

22   the Court, touching upon your qualifications to act as jurors in

23   the cause now before the Court, shall be the truth, the whole

24   truth, and nothing but the truth?

25           THE VENIRE:  Yes.

1           THE CLERK:  Thank you.

2           THE COURT:  Thank you.  You may be seated.

3     (Voir dire reported but not transcribed, at counsel's request.)

4           THE COURT:  Thank you, Madam Clerk.

5       Let me ask the parties and let me ask the government, first

6   of all, is there anyone sitting on this particular panel that the

7   government believes they have struck?

8           MS. JIANG:  No, Your Honor.

9           THE COURT:  The same question for the defense.

10  Mr. Sanders?

11          MR. SANDERS:  If I could just ask everyone to raise

12  their placards so I can just double-check?

13      No, Your Honor.

14          THE COURT:  Thank you.

15      All right.  It's been a long morning, and I know you need a

16  break.  I know we need a break; the attorneys need a break.  We

17  are going to release you for lunch.  I will give you about an

18  hour.  So if we could have you all back here about 1:35 or so, we

19  will start at 1:40.  And I have a set of instructions to give you

20  at the very beginning.  But we're about to take our first break,

21  and so the most critical thing is, one, to swear you in as the

22  panel for this particular case and, two, to give you just one

23  instruction about what may be applicable for you during the break

24  itself.  All right.

25      So if could I have you all rise, raise your right hand, and

1   pay attention to the oath.

2       THE CLERK:  Do you and each of you solemnly swear or

3   affirm that you will well and truly try the matter at issue now

4   before the Court and a true verdict therein render according to

5   the evidence?

6       THE JURY:  Yes.

7       THE CLERK:  Thank you.

8       THE COURT:  Thank you.

9     All right.  We are about to take our first break, and so,

10  remember -- I will give you more explicit instructions, but this

11  is probably the most important right now, since we're going to

12  break for the first time -- until the trial is over, you're not

13  allowed to talk about it, discuss it with anyone else.  That's

14  your fellow jurors, members of your family, anyone at all.  And

15  don't allow anyone to discuss it with you.  And that also applies

16  to anything electronically, all right?  Don't look up anything,

17  don't try to figure out, "Oh, what's happening here?  What do I

18  not know?"  No.  Because your job is to decide the facts based on

19  the evidence that comes out from the witnesses in the courtroom.

20  So if you were to hear anything else -- You are not going to be

21  allowed to talk to the attorneys at any point in time; they can't

22  talk to you.  In fact, they will avoid you.  They will go the

23  other way if they see you in the hallway or something.  For you

24  to look up anything else then would not be fair to either side

25  because they would have no clue what it is you're reading or

1  viewing or taking a look at.  Does that make sense to all of you?

2      You are free to hang out with each other, if you want.  If

3  you want to get to know each other, you are free to go separately

4  on your own during the break.  If you do, you can talk about

5  anything at all, including the horrible Husky loss, but, you

6  know, other than that, don't talk about anything having to do

7  with the case, the issues here, the kinds of things that you

8  heard during the voir dire process, all right?

9      And other than that, we will have you back here, like I said,

10  about -- you know, we will make it 1:40 now.  And I will give you

11  another set of instructions at that point in time, then the

12  attorneys will do their opening statements to you, so what they

13  expect the evidence to show, and then we will see if we have any

14  time to get some witnesses on today.

15          THE CLERK:  Your Honor, could we ask everyone to come

16  back to the other courtroom, which will be their jury room?

17          THE COURT:  Yes.  Yes.

18      And so because that little jury room back there is way too

19  small, does not have the ventilation that we feel is appropriate,

20  we are going to have your jury room be Judge Jones' courtroom.

21  So let me at this point in time have you go ahead and ...

22      You want them to go back into the courtroom?

23          THE CLERK:  No.  But that's where they should return.

24          THE COURT:  Okay.  So you are free to go to lunch at

25  this point in time and return to that courtroom.  Once we get

1   everybody back in here and ready to go, we will bring you back in

2   here, all right?

3      All rise for our jury, please.

4      (The following occurred outside the presence of the jury.)

5            THE COURT:  Counsel, one hour, and then we will go right

6   into openings as soon as we read the instructions.

7            MR. KOPCZYNSKI:  Your Honor, if I may?

8      We will have a couple of just scheduling questions and

9   housekeeping matters.  Is it appropriate to do that when we get

10  back from our break or --

11           THE COURT:  Yes.

12           MR. KOPCZYNSKI:  Okay.

13           THE COURT:  And let me indicate just one final thing for

14  the record, and that has to do with jury selection.

15     As we had agreed at the very beginning of this process, we

16  would excuse for cause -- all parties agreed -- that fully

17  unvaccinated jurors would be excused.  We excused Juror No. 5,

18  No. 6, and No. 19 for that reason.

19     The good part is that they were partially vaccinated, at

20  least a couple of them were, so we're getting there.  But, for

21  the record, those three were excused, as agreed by all.

22           MR. KOPCZYNSKI:  And one other question now, if I may?

23  Does the Court have a plan for when we stop today, for our own

24  witness purposes?

25           THE COURT:  Yes.  Yes.  4:30.

1      MR. KOPCZYNSKI:  4:30.  Okay.  Thank you, Your Honor.

2      THE COURT:  All right.  We will be at recess.

3                    (Recessed.)

4      THE COURT:  Thank you.  You may all be seated.

5    All right.  Counsel, anything to bring up before we bring our

6  jurors in?

7      MR. KOPCZYNSKI:  Your Honor, Phil Kopczynski for the

8  government.

9    Just a couple issues, briefly.  Number one, Levi Kauffman is

10  the lead case agent in this case.  He is on our witness list.

11  Right now we do not expect to call him, but it's possible we

12  could.  He's in the courtroom.  I discussed that with Mr. Cantor,

13  and I understand that there's no objection to his presence in the

14  courtroom.

15      THE COURT:  Okay.  That's fine.

16      MR. KOPCZYNSKI:  Okay.  Thank you.

17    As the Court suggested, the parties did confer on

18  admissibility of exhibits, and so we do have an agreement, to a

19  large extent, on a number of exhibits being admissible.

20    My plan would be, at the open of the government's case, to

21  simply present that as a stipulation and then listing, by exhibit

22  number, the government exhibits that we have agreed are

23  admissible, unless the Court has a difference process on that.

24      THE COURT:  No.  That will work.

25      MR. KOPCZYNSKI:  Okay.  Thank you.

1      The last thing is, thinking through our witnesses we will

2   have this afternoon, there will be some discussion of the

3   co-defendant, Sam Brooks, and that got us thinking about whether

4   the Court would like to give, I suppose, either during the course

5   of the government's case in chief or maybe this is at the

6   conclusion, but the Ninth Circuit's model instruction on a

7   co-defendant who's not in the courtroom and encouraging the jury

8   to not speculate about why that is.  And I have the language

9   here, which I took from the model instruction, if the Court would

10   like.  But we would suggest, given that, you know, Brooks will be

11   mentioned a fair amount, that the Court might give that

12   instruction.

13          THE COURT:  Have you shared that instruction with the

14   defense?

15          MR. KOPCZYNSKI:  Well, I have not.  It's just the model.

16   It's the model instruction.  And I can read the language.  It's

17   three sentences now, if you would like.

18          THE COURT:  Please.  Go ahead.

19          MR. KOPCZYNSKI:  So as taken from the model:  For

20   reasons that do not concern you, the case against Sam Brooks is

21   not before you.  Do not speculate why.  This fact should not

22   influence your verdict with reference to the defendant, and you

23   must base your verdict solely on the evidence against Ellen

24   Reiche.

25          THE COURT:  So let me ask, counsel, was that one of your

1   proposed instructions in your original instructions to the Court?

2           MR. KOPCZYNSKI:  We did not put that in our proposal.

3   And like I say, I apologize.  It just really occurred to us more

4   recently thinking about what our evidence -- case-in-chief

5   evidence would be, that there just will be a fair amount of

6   discussion of Brooks.  It's kind of just a natural part of the

7   story.

8           THE COURT:  All right.  Anything else besides that?

9           MR. KOPCZYNSKI:  That's it.  Thank you, Your Honor.

10          THE COURT:  Okay.  Mr. Sanders, Mr. Cantor, any response

11  to that final point?

12          MR. CANTOR:  I don't -- I don't think I have a problem

13  with that instruction.  I do want to look at the commentary to

14  see if that instruction is more appropriate if there's testimony

15  that Sam Brooks, for example, has been charged.  If there is no

16  testimony that Sam Brooks has been charged, I'm not sure if that

17  instruction applies.  But that's something that I want to look

18  at.

19      Other than that, you know, I don't see -- if the instruction

20  encourages us to read that to the jury if the testimony is that

21  Sam Brooks was arrested, implicating a charge that would follow,

22  then I would have no problem with that instruction.  But that's

23  something that I would like to look at before I make a final

24  decision on that, and that is, what does the commentary say about

25  that instruction and under what circumstances should it be --

1    should it be read to the jury, specifically if there is testimony

2    or if the Indictment that's read to the jury also reads that Sam

3    Brooks, or a co-defendant, have been charged together with the

4    defendant in a case.

5          THE COURT:  Certainly understood, Mr. Cantor.  And I

6    think you should have that opportunity, and you will.

7       The Court is quite familiar with the model instruction.  And,

8    Mr. Kopczynski, I think it would be appropriate to give it under

9    most circumstances, but let's give counsel an opportunity to take

10   a look at that commentary, like he said, and depending upon how

11   the evidence comes out.

12         MR. KOPCZYNSKI:  Thank you, Your Honor.

13         THE COURT:  Ready for our jury?

14         MR. KOPCZYNSKI:  Yes.

15         THE COURT:  Bring them in, please.

16       (The following occurred in the presence of the jury.)

17         THE COURT:  And you may be seated.  Thank you.

18      It's the first day of kindergarten for one of my

19   grandchildren and I could just imagine the same thing trying to

20   happen there.  You did a good job.

21      So welcome back, ladies and gentlemen.  You are now the

22   jurors in this particular case.  And I want to take just a few

23   minutes to tell you a little something about your duties as

24   jurors, to give you some preliminary instructions.

25      If you remember, I told you at the end of trial, I will give

1  you a much more detailed set of instructions in writing that will

2  control your deliberations.  But just to remind me, how many of

3  you have been jurors before previously at any point in time?

4  Only three?  Okay.

5      Well, when you deliberate, it will be your duty to weigh and

6  to re-evaluate all the evidence received in the case, and in that

7  process, decide the facts.  To the facts as you find them, you

8  apply the law as I give it to you, whether you agree with the law

9  or not.  You must decide the case solely on the evidence and the

10  law before you.  Perform these duties fairly and impartially.

11  Please don't be influenced by any person's race, color, religious

12  beliefs, national ancestry, sexual orientation, gender identity,

13  gender, or economic circumstance.  Also, do not allow yourself to

14  be influenced by any personal likes, dislikes, sympathy,

15  prejudice, fear, public opinion, or biases, including unconscious

16  bias.  Unconscious biases are stereotypes or attitudes or

17  preferences that people may consciously reject but may be

18  expressed without conscious awareness, control, or intention.

19  Like conscious bias, unconscious bias can affect how we evaluate

20  information and make decisions.

21      As you have heard, this is a criminal case brought by the

22  United States government.  The government charges the defendant

23  with violence against railroad carriers as well as conspiring and

24  attempting to do the same.  The charges against the defendant are

25  contained in the Indictment, and that Indictment simply describes

1   those charges that the government brings.  That Indictment is not

2   evidence and does not prove anything at all.

3       The defendant has pleaded not guilty to the charges and is

4   presumed to be innocent unless and until the government proves

5   the defendant guilty beyond a reasonable doubt.  In addition, the

6   defendant has the right to remain silent and never has to prove

7   innocence or present any evidence whatsoever.

8       In order to help you follow the evidence, let me give you

9   just a brief summary of the elements of the crime that the

10  government must prove to make its case.  To find the defendant

11  guilty of violence against railroad carriers in violation of

12  Title 18, United States Code, Section 1992(a)(5), (a)(10),

13  (c)(1), and 2, the government must prove the following things:

14  Number one, first, the defendant knowingly impaired the operation

15  of a railroad signal system; two, second, the defendant did so

16  without lawful authority or permission; and, three, finally, the

17  conduct was against and affecting a railroad carrier engaged in

18  interstate or foreign commerce.

19      The evidence you are to consider in deciding what the facts

20  are consist of the following three things:  the sworn testimony

21  of any witness from the witness stand, any exhibits that are

22  received into evidence, and any facts to which the parties agree

23  or stipulate.  The following things are not evidence, and that

24  means you are not to consider them, must not consider them as

25  evidence in deciding the facts of this case:  statements and

1   arguments of counsel; questions and objections of the attorneys;

2   testimony that you are instructed by me to disregard; and

3   anything you may see or hear when the court is not in session,

4   even if what you see or hear is done or said by one of the

5   parties or by one of the witnesses.

6       Now, evidence may be either direct or circumstantial.  I'm

7   sure you have all probably heard those two terms somewhere in

8   your life.  Direct evidence is direct proof of a fact, such as

9   testimony by a witness about what that witness personally saw or

10  heard or did.  Circumstantial evidence is indirect evidence; that

11  is, it is proof of one or more facts from which one can find

12  another fact.  It sounds kind of strange, like, "Well, what does

13  that really mean in real life?"  Let me give you just one real

14  brief example.  You have a witness on the stand that says, "It

15  rained last night at my house."  "How do you know?"  "I looked

16  outside and I saw the rain coming down."  Direct evidence.  The

17  same witness, "It rained last night at my house."  "How do you

18  know?"  "Well, I woke up this morning.  The lawn was wet."  Maybe

19  it did rain, maybe the sprinkler system went off, maybe your

20  neighbors used their hose.  Understand?

21      So you, as jurors, are free to consider both direct and

22  circumstantial evidence.  Either can be used to prove any fact.

23  The law makes absolutely no distinction between the weight to be

24  given to either direct or circumstantial evidence.  It is for you

25  to decide how much weight to give to any evidence.

1        There are rules that control what can be received into

2    evidence.  When a lawyer asks a question or offers an exhibit

3    into evidence and the lawyer on the opposing side believes that

4    that is not permitted by those rules, that lawyer has a duty to

5    object.  If I overrule the objection, the question may be

6    answered and the exhibit will be received.  If the Court sustains

7    the objection, the question cannot be answered, the exhibit will

8    not be received.  Whenever the Court sustains an objection to any

9    question, you are to ignore the question and not try to guess as

10   to what the answer might have been.

11       Sometimes I may order that evidence be stricken from the

12   record, and that means you are to disregard or ignore that

13   particular evidence.  That means when you're deciding the case,

14   you are not to consider the evidence or anything that you were

15   told to disregard.

16       In deciding the facts in a case, you may have to decide which

17   testimony to believe, which testimony not to believe.  You may

18   believe everything a witness says or part of it or none of it.

19   In considering the testimony of any evidence witness, you may

20   take into account the following eight things.  Number one, the

21   witness's opportunity and ability to see or hear or know the

22   things testified to; number two, the witness's memory; three, the

23   witness's manner while testifying; four, the witness's interest

24   in the outcome of the case, if any; five, the witness's bias or

25   prejudice, if any; six, whether other evidence contradicted the

1   witness's testimony; seven, the reasonableness of the witness's

2   testimony in light of all the evidence presented; and, finally,

3   eight, any other factors that bear on believability.

4       You are to avoid bias, conscious or unconscious as we

5   indicated before, based on race, color, religious beliefs,

6   national ancestry, sexual orientation, gender identity, gender,

7   or economic circumstances in that determination.  Also, the

8   weight of the evidence as to a fact does not necessarily depend

9   on the number of witnesses who testify about it.  What is

10  important is how believable the witnesses are and how much weight

11  you think that testimony deserves.

12      Remember before our first break this morning I talked a

13  little bit about your conduct as jurors.  Let me give you a

14  little bit more detailed instruction on that.  First, please keep

15  an open mind throughout the trial.  Do not decide what the

16  verdict should be until you and your fellow jurors have completed

17  your deliberations at the end of the entire case.  Secondly,

18  because you must decide the case based only on the evidence

19  received in the case and on those instructions of law that apply,

20  you must not be exposed to any other information about the case

21  or to the issues it involves during the course of your jury duty.

22  Thus, until the end of the case, or unless I tell you otherwise,

23  do not communicate with anyone in any way and please don't let

24  anyone else communicate with you in any way about the merits of

25  the case, the facts of the case, anything at all to do with this

1  case.  This restriction includes discussing the case in person,

2  in writing, by phone, tablet, computer, any other means, via

3  e-mail, text messaging, internet, chat rooms, blogs, websites,

4  applications, including, but not limited to, Facebook, YouTube,

5  Twitter, Instagram, LinkedIn, Snapchat, TikTok, whatever you can

6  think of.  You get the point, right?  And as I told you at the

7  very beginning this morning, right before the break, the reason

8  for that is quite simple -- you're not allowed to talk to

9  counsel; they can't talk to you -- if you learn something out

10 there, there's no way for them to test the validity of that or

11 where you got that information from, and that wouldn't be fair to

12 one side or the other or perhaps even both.

13     Don't allow anyone else to have any kind of conversation with

14 you about the case itself.  And I know the very first thing

15 that's going to happen when you get home tonight, the people that

16 live with you, in your household, what are they going to say?

17 "What happened?  Are you on the jury?  What's going on?  What's

18 the case all about?"  I will tell you a little about that when

19 we break at the very end, all right?  There are some things you

20 can say, obviously, but then there are other things that I want

21 you to say, and there's a reason for that, basically to explain

22 to them why you can't tell them anything and you can't discuss

23 the case with them, and I think they will understand.

24     If you are ever asked or approached in any way about your

25 jury service, about anything to do with this case, don't say

1    anything to any of the other potential jurors in this case, but

2    simply let our court clerk know about it, all right, and then we

3    will just follow up with you individually to find out what you

4    heard, what happened, and get to the bottom of that.

5        I don't know whether or not the media will report on this.

6    Sometimes they do, sometimes they don't.  It's just depending on

7    what kind of news day is out there.  They're always checking to

8    see what kind of trials are going on in federal court.  But

9    because of that, please be very aware that you are to stay away

10   from anything like that.  So don't read, don't watch, don't look

11   at anything in the media that might have anything at all to do

12   with this particular case.  If, like me, you like to read the

13   paper in the morning -- well, I don't know how many of us

14   actually read the paper in the morning, but you know what I mean,

15   right -- if you like to look at that, maybe have someone else go

16   through the local section before you and say, "Oh, yeah, there's

17   a story that might relate to that"; just put it aside and wait

18   until the trial is over for you to go ahead and take a look at

19   that.  All for the same reasons, right?  I don't have any

20   information indicating that there will be any kind of news

21   reports or anything like that, but it could happen.  So just be

22   aware and be on the lookout.

23       You're also not allowed to visit or view any of the places

24   discussed in this case.  I know that when I looked at our jury

25   pool this morning, we had several people from Whatcom County.

1          Is anyone here from Whatcom County right now?

2          All right.  None of you.  So I doubt any of you are going to

3    be driving up to Whatcom County to take a look at any of this.

4    But don't, again, for the same exact reason that we discussed

5    earlier.

6          Don't do any research about the case, the law, or the people

7    involved, including the parties, the witnesses, the lawyers,

8    until after you have been excused as jurors.  If you do happen to

9    inadvertently read something or view something that you believe

10   is directly connected to this case, again, don't say anything to

11   any of your fellow jurors; simply mention it to Ms. Cuaresma, she

12   will bring it to my attention, we will deal with it at that point

13   in time.

14         These rules are designed to protect the parties' right to

15   have this case decided only on the evidence that is presented in

16   the courtroom and nowhere else.  Witnesses here in court will

17   take that oath to tell the truth in front of you.  And the

18   accuracy of their testimony is tested through this entire

19   process.  If you were to do any research or investigation outside

20   of that or gain any information through improper communications,

21   then your verdict could possibly be influenced by that, and it

22   could be influenced by inaccurate, incomplete, or misleading

23   information that the attorneys have not had any opportunity to

24   challenge.

25         Each of the parties is entitled to a fair trial by an

1   impartial jury.  That's why we went through that whole process

2   this morning.  And if you decide the case based on information

3   that's not presented in the court, you will deny the parties that

4   fair trial.

5        Remember, you have taken an oath to follow these rules, and

6   it's very important that you do so.  Any juror who violates

7   these restrictions actually jeopardizes the fairness of the

8   proceedings, and a mistrial could result that would require the

9   entire process to start all over again.  So, bottom line, if you

10  are exposed to anything at all that you believe is directly

11  connected to this case, don't say anything to anyone else, bring

12  it to the attention of our court clerk, and we will deal with it.

13       At the end of the trial, you will have to make your decision

14  based on what you recall of the evidence.  You will not have a

15  written transcript of the trial, even though our court reporter

16  is taking down everything that is said in the courtroom.  I urge

17  you, therefore, to pay close attention to the testimony as it is

18  given.

19       The witnesses who testify will walk into the courtroom

20  masked, like everyone else who is not talking in here, but when

21  they take the stand, I will ask them to lower their mask so that

22  you can see their entire face.

23       If you wish, you may take notes to help you remember the

24  evidence.  If you do take notes, please keep them to yourself

25  until you and your fellow jurors go to the jury room to decide

1    the case.

2        Did we hand out the tablets?

3            THE CLERK:  Not yet.

4            THE COURT:  We forgot.

5            THE CLERK:  I will get them.

6            THE COURT:  Only because it's been 18 months since we

7    had any kind of trial or anything, I guess.

8        Don't let note-taking distract you from being attentive.  I

9    remember taking organic chemistry in undergrad, and I was such a

10   good note-taker I could not have told you anything the professor

11   said because I was so busy taking notes.  That's exactly the

12   opposite of what we want you to do here in the courtroom.

13   Understand?  I mean, that makes sense, right?

14       When you leave court for recess, your notes should just, you

15   know, go with you back into your break room.  We're not going to

16   put you in there, but we will use that other courtroom.  No one

17   will read your notes at any point in time.

18       Whether or not you take notes, you should rely on your own

19   memory of the evidence.  Notes are only there to assist your

20   memory.  You should not be overly influenced by your notes or

21   those of your fellow jurors.

22       All right.  Let's talk a little bit about the phases of the

23   trial and what's going to happen next.  First, each side may make

24   an opening statement.  Not argument, simply a statement.  It's

25   not evidence.  It's an outline to help you understand what that

1    party expects the evidence will in fact show.  By the way, a

2    party is not required to make an opening statement if they don't

3    want to.  The government will then present evidence.  Counsel for

4    the defense may cross-examine those witnesses as called.  Then,

5    once the government concludes their evidence, if the defendant

6    chooses to offer any evidence at that point in time -- remember,

7    there's no burden for the defendant to do so -- then they may

8    call witnesses, and counsel for the government, of course, will

9    have the opportunity to cross-examine.

10        After all the evidence has been presented, the Court will

11   instruct you on the law that applies to the case, and the

12   attorneys then will get their final opportunity to argue in

13   closing argument what they believe that evidence has in fact

14   shown.

15        After that, you go to the jury room to deliberate on your

16   verdict.

17        Ms. Cuaresma also indicated a couple of things, just a couple

18   little housekeeping things, and before we get started, it's

19   probably a good time to just remind you of some of those.

20        Number one, we will be taking all the breaks -- and we're not

21   going to have another break this afternoon because we're starting

22   late and we're going to release you all at 4:30 at the latest --

23   the breaks will all be in the adjoining courtroom, all right,

24   because that room is just way too little back there.  Secondly,

25   please wear your juror badges whenever you are in the courthouse,

1    whenever you are walking the courthouse.  If you leave the

2    courthouse, or once you leave the courthouse, take the juror

3    badge off.  Nobody on the street needs to know you are a juror.

4    Okay?  The reason you wear them here is so that everybody in the

5    courthouse knows that you're a juror:  the parties, the

6    litigants, witnesses.  Remember, I read that list of potential

7    witnesses.  Well, they will be hanging around waiting to testify

8    and they might inadvertently see you somewhere along the way, you

9    might see them.  You don't know them; they don't know you.  But

10   if you have the juror badge on, they know, oops, a potential

11   juror, it could be a potential juror on my case.

12        Today, you know, we had lunch at kind of an odd hour.

13   Typically we try to take lunch between 12:00 and 1:00.  And

14   tomorrow, so that you don't have to go outside, so that we can

15   kind of streamline things, I'm going to buy you lunch tomorrow.

16   So, in the morning, Ms. Cuaresma will actually have a form, a

17   little sheet, that indicates the different things that are

18   available from the place that we can get lunches from, and you

19   can just mark on there.  And you will take your lunch in that

20   jury room, in the courtroom.  All right?  That doesn't mean you

21   have to stay there if you don't want to.  That's perfectly fine.

22   If you want a break, you want to walk around for a little bit,

23   that's perfectly allowable as well.  I'm just trying to minimize

24   the number of contacts that you have outside of the courthouse.

25        Any questions from any of you about anything that I've said

1    so far?

2       Yes.

3          JUROR NO. 13:  Your Honor, you -- what about when you --

4    When they have objections and you say "No," you know, that isn't

5    really part of the information that we have when we start to

6    deliberate; is that correct?

7          THE COURT:  Correct.

8       If you remember, one of the instructions is what the

9    attorneys say -- everything the attorneys say is not evidence.

10   I know that sounds kind of weird, doesn't it?  Because you have

11   to understand what the answer is based on the attorney's

12   question.  But the questions themselves, anything said by the

13   attorneys, is not evidence.  So, therefore, if the court sustains

14   an objection and there's nothing delivered, there's nothing

15   coming from the witness stand.

16      All right.  Any other questions, anything about the

17   logistics, anything else like that?

18      Madam Clerk, if you would hand out the --

19          THE CLERK:  I will in just a minute.

20          THE COURT:  Yes.  I feel like it's my first day back at

21   school too.

22      It's good to see all of you here.  It really is.  And like I

23   told you before, I sincerely appreciate the effort that all of

24   you have gone through to be here.  Believe me, I certainly do.

25      All right.  Thank you very much, ladies and gentlemen.  Now,

1    would you please give your kind attention to the opening

2    statement of the government.

3        Mr. Kopczynski.

4        MR. KOPCZYNSKI:   Thank you, Your Honor.

5        One night last November, near midnight, in the pitch dark,

6    the defendant ventured out onto railroad tracks near Bellingham.

7    She was dressed all in black, head to toe.

8        Out there on the tracks, she and another person, working

9    together, put a device called a "shunt" onto the rails.  A shunt

10   is essentially a piece of heavy gauge wire that's fastened from

11   one rail to the other.  And what a shunt does is interfere with

12   the signal system that trains use.  The signal system is how

13   trains move safely and efficiently over rails, and what the shunt

14   does is disrupt all that.

15       The defendant placed a shunt on those rails, and she's

16   charged in this case with that act of violence against a railroad

17   carrier.  The evidence will show she's guilty as charged.

18       Let me just pause here briefly and again say thank you, good

19   afternoon.  I know the circumstances of COVID make this all

20   unusual and challenging.  Your service as jurors is essential.

21   And my colleague and I have the job, during this short trial, of

22   presenting the evidence that will show you, the jury, that the

23   defendant is guilty beyond a reasonable doubt.

24       So this is my opportunity to talk a little bit about what

25   that evidence will be.  So, as I said, the story begins that

1   night in November, last November.  It was November 28th, a few

2   days after Thanksgiving.  And a person you will hear from, named

3   Tyler Nies, he's keeping a close eye on the tracks in Bellingham.

4   Mr. Nies works for the police force for Burlington Northern Santa

5   Fe Railroad.  We call that BNSF sometimes.  And BNSF is a

6   railroad carrier that operates throughout the country, many

7   different states.  They go up over the border into Canada and

8   they carry things, a whole variety of commodities, including

9   things like oil, coal.  And over many months last year, BNSF had

10  a problem with shunts on the rail, on its rails.

11      And as I said, a shunt, which you will hear about in detail

12  from multiple witnesses, a shunt essentially tricks the signal

13  system of the railway into thinking there's another train on the

14  tracks.  And the evidence will be that the rails actually carry a

15  low-voltage current.  And so if maybe by chance you know anything

16  about circuits and currents -- even if you don't, that's fine; a

17  witness will explain all of this -- the shunt, by connecting one

18  rail to another, the evidence will show that that's essentially

19  what a train does between its wheels and its axle; it connects

20  the two rails.  And that's actually how the BNSF trains keep

21  track of whether a train is on the tracks and where it is.

22      And the thing about these trains is, particularly freight

23  trains, they're heavy, right?  So it's not like a passenger car

24  where you see the yellow light and you hit the brakes and you

25  come safely to a stop, maybe 100 feet.  A train, the evidence

1    will be, can take a mile or more to stop.  If there's something

2    in the way, you need a mile or more to stop that freight train.

3    So this signal system does the very important job, and needs to

4    be carefully calibrated, to keep all the big freight trains

5    moving over the rails, moving safely, so they don't collide with

6    one another, so they don't collide with cars at railroad

7    crossings.  And you will hear a witness explain that in the best

8    of circumstances when this shunt, this wire device, is

9    unexpectedly put on the rails, in the best of circumstances what

10   that will do is surprise any oncoming trains.  They could be

11   miles away, but that could be close enough where suddenly it's

12   showing there's a train up ahead and they have to quickly brake,

13   they're delayed.  That's the best case, delayed.  It can also be

14   a lot worse.  There was a situation last year in October, a train

15   had to brake so hard that it actually broke in two.  Emergency

16   braking so fast, it separated.  You will hear a little bit about

17   that from one of the witnesses.

18        And these shunts, as I said, also interfere with crossings.

19   That's where you drive your car over railroad tracks.  And if a

20   shunt is placed near a railroad crossing, that can cause that to

21   malfunction.  You will hear a witness explain what the ordinary

22   warning time is, how many seconds you are supposed to get before

23   the train arrives at the crossing, and how a shunt can

24   dramatically shorten that warning time or in some cases give you

25   no warning at all.  The lights, the dinging sound, the bars, none

1 of that would happen if you have these shunts unexpectedly placed

2 on the rails.

3      An expert witness from BNSF will be called by the government

4 to explain all of those concepts:  the signalling system and what

5 the shunt does.

6      And that's all background to Tyler Nies on high alert that

7 night in November, because of this history of shunts being put on

8 the rails.  He had actually placed cameras at various places on

9 the system to look at the rails and look out for people.  And it

10 was that night in November he got an image -- he will testify it

11 was sent to his phone, I believe -- and he sees this image, and

12 it looks like one or maybe two people -- it's pitch dark, it's a

13 night-vision image -- but it looks like one or two people out

14 there on the rails.  So he promptly calls the sheriff's office.

15      And you will hear from two deputies from the Whatcom County

16 Sheriff's Office who responded.  Their names are Deputy Chambers

17 and Deputy Streubel.  So they sort of split up and they approach

18 that area that Tyler Nies had sent them to.  Deputy Chambers puts

19 on his floodlight from his patrol vehicle and he spots two people

20 out on the tracks.  He will testify that that was about 100

21 yards, give or take, from his car, down the tracks.  It's near

22 midnight.  It's a cold night.  He spots two people out there on

23 the tracks.

24      The evidence will show that those people are the defendant

25 and another person, Sam Brooks.  The evidence will show that

1    they're out there working in tandem.  First, they're both dressed

2    in all black.  They try to run.  Deputy Chambers says, "No.

3    Stop."  He catches up with them, and they talk, and then they

4    tell a story that the evidence will show is preposterous.

5         They first say, although it's nearly midnight on a cold

6    night, they're out there looking for keys, a set of keys.  It

7    turns out they don't have a flashlight.  The evidence will be

8    they didn't have their phones on them.  Sometimes you use your

9    phone flashlight.  They don't have that either.

10        The evidence will be that the deputies offered to help them

11   look.  "Oh, you are looking for your keys you left out here.

12   We'll help you look."  The evidence will be they weren't

13   interested in that.

14        The evidence will also show the defendant is holding a paper

15   bag.  Deputy Chambers finds her out there on the tracks, she's

16   holding this paper bag, and as they're talking, "What are you

17   doing out here?"; they're chatting and going back and forth, at

18   some point the defendant is asked, "What's in that bag?"  And

19   it's a couple days after Thanksgiving, but the defendant says,

20   "Oh, this is Thanksgiving leftovers."  We thought as we were out

21   walking the tracks in the pitch dark maybe we would get hungry,

22   so we brought leftovers.

23        Deputies, later, using their legal authority to look in that

24   bag, find, of course, it's not Thanksgiving dinner.  What's in

25   there?  First of all, it's a big thick piece of wire.  Second of

1  all, it's a drill and a brush bit.  You will see pictures of this

2  during the trial.  But a drill with a brush bit would be used --

3  you will hear testimony about this -- would be used to polish

4  rust off of the train rail to get a better connection between the

5  wire and the rail.  That's what you could use a drill with a

6  brush bit for.  And that's in that bag.  So the defendant is

7  caught holding a bag with the tools you would use to put a shunt

8  on the rails.

9      More than that, the deputies soon found a shunt connecting

10  the rails.  As I said, it was cold that night, and the deputies

11  will testify -- Deputy Chambers in particular -- that he walked

12  out to the exact spot he had first seen the defendant.  There was

13  frost on the rails and the rocks between the rails, except in one

14  spot where it looked like things had been disturbed and there was

15  no frost.  So he shines his light on that, he pokes around a

16  little bit, and, sure enough, buried under the rocks is a wire

17  connecting the two rails, right at that spot where he had found

18  the defendant.

19      So this will be a short trial.  I would ask you to keep an

20  open mind until the end, as the judge encouraged you to do so.

21  The nature of trials is that each bit and piece of evidence comes

22  in from a different witness, and at the end, we get a chance to

23  put it all together.  We will have another chance at the end of

24  the trial to get up and sum up for you the evidence.  The judge

25  will instruct you on the law, as he said he would, and we will

1   have a chance to argue to you and explain to you exactly why the

2   evidence we presented shows the defendant is guilty.  And at that

3   point, at the end of the trial, we're going to encourage to you

4   consider all that evidence, use your common sense.

5       The evidence, in summary, will be the defendant is out there,

6   found on the tracks in the middle of the night, moments after she

7   placed that shunt that is found attached between the two rails.

8   You will see the shunt, you will hear from the deputy who found

9   it, and you will hear about this story that is so patently

10  unbelievable that the defendant and Brooks told about what they

11  were doing and about that bag that the defendant is carrying

12  that turns out to have the exact tools, including a big piece of

13  wire that you would use to put a shunt on the rails.

14      So we expect at the end of this case there's really only

15  going to be one possible conclusion, which is the defendant is

16  guilty.

17      Thank you.

18          THE COURT:  Thank you, counsel.

19      Please, ladies and gentlemen, give your kind attention to

20  Mr. Cantor for the opening statement of the defense.

21          MR. CANTOR:  Thank you, Your Honor.  Thank you, members

22  of the jury.

23      This case is not about whether shunting is bad.  That's not

24  what this case is about.  It's not about whether tripping or

25  interfering or impairing signal systems is bad.  This case is

1  simply about whether Ellen Reiche is responsible, was

2  responsible, for that wire that was found on November 28th, 2020,

3  last year.  That's what this case is about.

4      You just heard the government tell you that at this trial

5  they are going to prove that Ms. Reiche placed a shunt on the

6  railroad.  That's what you heard the prosecutor just tell you.

7  We dispute that.  We dispute that wholeheartedly.

8      The evidence will show that this particular area, which is a

9  corridor of railroad tracks that runs along a park up in

10  Bellingham called Marine View {sic} Drive Park, that this

11  particular park and this particular area is known for

12  trespassing.  It's such a frequent event that the local police,

13  including the BNSF, the Burlington Northern Santa Fe Police had

14  to do something about it.  I mean, think about it.  You have a

15  park nearby a railroad track, and it's going to invite people who

16  are going to want to explore.  So what local law enforcement did,

17  what the Burlington Northern Santa Fe Police did, is exactly what

18  counsel said, they installed these cameras all over the place --

19  cameras that are motion activated, cameras that pick up any kind

20  of movement.  And they did that for a reason.  They did that so

21  they can find out who these trespassers were.

22      But you know what, members of the jury?  You will learn

23  through this trial that the motion-activated cameras actually

24  worked, because on November 28th of 2020, at 11:24 p.m. to be

25  precise, the cameras caught two trespassers.  Yes, Ms. Reiche and

1    her friend were trespassing.  They were walking along the

2    railroad track on private property when they were not supposed to

3    and the cameras caught that.  But that's all the cameras caught:

4    two people trespassing.

5         Burlington Northern Santa Fe Police contact Whatcom County

6    Sheriff and the sheriff's office officers arrive within minutes.

7    They are on the scene within minutes.  And Deputy Chambers

8    arrives to the railroad crossing, as counsel says, shines a

9    spotlight about 100 yards to the north, and spots the two

10   trespassers.  And he sees the two trespassers, but that is all he

11   sees.  He then does what he supposed to do and he tells these

12   trespassers, "Stop where you are.  Come to me."  Essentially, you

13   guys are breaking the law, it's illegal to trespass.  And

14   Ms. Reiche and her friend comply.  Ms. Reiche and her friend walk

15   toward the deputy, the deputy walks towards them, and they

16   eventually meet.

17        This business about the bag and what was in the bag and the

18   statements made about the bag prove nothing, and you will learn

19   from this trial that they prove nothing.  Here is why:  Because

20   you will learn in this trial that the contents of this bag that

21   counsel just summarized for you -- the gloves, the drill, a

22   wire -- were sent to the FBI Crime Lab two days after these items

23   were collected, and the FBI agents that will testify will tell

24   you that they did that for a reason, they wanted to do forensic

25   testing on these items that were collected.  Why?  Because we

1  want to know who wore the gloves, we want to know who handled the

2  drill, we want to know who handled this wire, including the wire

3  that was recovered from the tracks.  We're the FBI.  The FBI, we

4  can do DNA testing, we can look for prints.  This is what we do,

5  this is what we are good at.  And that's why they took the steps,

6  took the effort, made the decision to send all of these items to

7  the crime lab for testing.

8      Nine months later, you will hear nothing about the results,

9  nothing about Ms. Reiche or anybody else handling those items.

10  The items in that bag prove nothing.

11      At the end of this trial -- Again, you will hear a lot of

12  testimony about how shunting is bad and how it's a problem and

13  how it has been a problem for the past year and that it can cause

14  trains to deploy their emergency brakes and cause some damage.

15  You will hear testimony about that, but that's not what this case

16  is about.

17      At the end of this trial, there will be no evidence that

18  proves beyond a reasonable doubt that Ms. Reiche was responsible

19  for placing that one piece of wire under the ballast of the

20  railroad tracks.  Not any evidence that will prove beyond a

21  reasonable doubt that she was responsible.  There won't even be

22  proof beyond a reasonable doubt that this one piece of wire

23  impaired the signal systems of the railroad.

24      She may be guilty of trespassing, but Ms. Reiche is not

25  guilty of violence against railroads.

1        Thank you for your attention.

2              THE COURT:  Thank you, counsel.

3        The government may call their first witness.

4              MR. KOPCZYNSKI:  Your Honor, a preliminary matter.  The

5    parties have a stipulation on the admissibility of certain

6    exhibits, and with the Court's permission, I'll read that for the

7    record.

8              THE COURT:  That will be fine, counsel.  Just go slow

9    enough that our court reporter can track these accurately.

10             MR. KOPCZYNSKI:  Of course.

11       The parties agree that the following exhibits premarked by

12   the government are admissible:  Exhibit 12, specifically pages 12

13   through 14 and 17 through 22; Exhibit 24 --

14             MR. CANTOR:  I'm sorry.  If we can just go -- I just

15   want to make sure we're all correct.

16       So going to Exhibit 12, please read the page numbers one more

17   time.

18             MR. KOPCZYNSKI:  12 through 14 and 17 through 22.

19             MR. CANTOR:  12 through 14, correct, and then 17

20   through 22?

21             MR. KOPCZYNSKI:  Yes.

22             MR. CANTOR:  Yes, I agree.

23             MR. KOPCZYNSKI:  Exhibit 24, Exhibit 26 and specifically

24   pages 3, 4, 8, 17, 25, 27, 30, 31, 32, and 35 -- those are all

25   pages of Exhibit 26 -- and then Exhibits 32, 33, 34, 35, and 36.

1        The government moves to admit all of that into evidence.

2              MR. CANTOR:  No objection.

3              THE COURT:  Thank you very much, counsel.

4        Madam Clerk, did you get all of those?

5              THE CLERK:  Yes, I did.

6              THE COURT:  They will be admitted.

7        (Exhibit No. 12, pgs. 12-14 and 17-22; Exhibit No. 24; Exhibit

8        No. 26, pgs. 3-4, 8, 17, 25, 27, 30-32, and 35; Exhibit Nos.

9        32, 33, 34, 35, and 36 admitted.)

10             THE COURT:  All right.  Counsel, you may call your first

11   witness.

12             MS. JIANG:  The government calls Tyler Nies.

13             THE COURT:  Good afternoon.  If we could have you come

14   up here in front of our clerk and raise your right hand to be

15   sworn.

16                       TYLER D. NIES,

17        having been sworn under oath, testified as follows:

18             THE CLERK:  Thank you.  Please have a seat.

19        Can you please state your name for the record and spell it

20   for our court reporter?

21             THE WITNESS:  Tyler David Nies.  Last name is spelled

22   N-i-e-s.

23             THE CLERK:  Thank you.

24             THE COURT:  Mr. Nies, thank you.

25        Mr. Nies, because the jurors get to watch the demeanor of any

1  witnesses and stuff, would you feel comfortable removing or

2  lowering your mask during your testimony?

3              THE WITNESS:  Absolutely.

4              THE COURT:  All right.  You may do so then.

5         Ms. Jiang, you may inquire.

6              MS. JIANG:  Thank you, Your Honor.

7                       DIRECT EXAMINATION

8  BY MS. JIANG:

9  Q   Good afternoon, Mr. Nies.

10  A   Good afternoon.

11  Q   Where do you presently work?

12  A   I work for the BNSF Railway Police.

13  Q   What is BNSF?

14  A   So BNSF Railway is a Class I railroad in the United States.

15  Q   How long have you been at BNSF?

16  A   I started in June of 2012.

17  Q   So you have been there for about nine years?

18  A   That is correct.

19  Q   What is your present role at BNSF?

20  A   So my title is Deputy Chief of Police, and I supervise the

21  BNSF Railway's Police Department in Western Washington and

22  British Columbia.

23  Q   What does BNSF do?

24  A   BNSF is a freight rail carrier.  So they transport goods

25  across the rail lines.

1    Q    What types of goods?

2    A    Anything you can think of.  So we do a lot of container

3    traffic, which contains electronics, household goods, to

4    hazardous materials, chemicals, crude oil, coal.  Everything.

5    Just about anything is transported by rail in this country.

6    Q    What geographic area does BNSF operate in?

7    A    BNSF, so the headquarters are in Fort Worth, Texas, but it's

8    basically a western railroad.  BNSF operates in 28 states and

9    then into Canada as well, primarily into British Columbia and a

10   yard in Winnipeg.

11   Q    So BNSF delivers all of those commodities to different states

12   and to Canada?

13   A    Correct.

14   Q    Did you respond to an incident on the night of November 28th,

15   2021?

16   A    Yes, I did.  Uh --

17   Q    I'm sorry.  2020.

18   A    Yeah --

19   Q    I got the year wrong.

20   A    -- 2020.

21        Yes, I did.

22   Q    How were you notified about the incident?

23   A    So it was an observation from a game camera or a surveillance

24   camera that I was monitoring at the time.

25   Q    Why were game cameras installed?

1    A    So over -- starting in January of 2020, in Whatcom and Skagit

2    County primarily, we had been experiencing at BNSF people placing

3    what we call a shunt on the railroad tracks that we were

4    investigating as an act of vandalism to interrupt train traffic.

5    Q    What is a shunt?

6    A    In this sense, it can be a jumper cable or a piece of wire or

7    metal that somebody would connect to two sets of railroad tracks.

8    So, basically, one end of a wire or a jumper cable with the

9    prongs or the metal would be affixed to each side of the rail,

10   which basically interrupts, like, the signal system.

11   Q    Why did you care that the signal system was interrupted?

12   A    So BNSF, like, we were to say that, like, any railroad is

13   like a very unforgiving environment.  So it's a safety issue,

14   number one.  Like any interruption to that signal system

15   endangers the lives of the public and the communities that live

16   around our railroad tracks, our employees.  These things are put

17   in place as a safety protocol to make sure the trains stay on the

18   tracks.

19   Q    Now, you mentioned there have been a number of incidents

20   that occurred in 2020.  Were there any safety issues posed by

21   those prior instances?

22   A    Yes, there were.

23   Q    Please tell us about it.

24   A    So in responding -- So with that signal system, a lot of the

25   stuff is tied into railroad crossings where the gate arm would

1    come down.  Where some of these shunts were placed, speaking with

2    our signal maintainers and our operations people, those shunts

3    would interfere with, like, how that crossing could function.

4        We had another incident that -- it was in October of 2020 --

5    that basically the shunt was placed in front of a train that was

6    approaching and caused that train to go into an emergency braking

7    activation and caused the train to separate, like, very

8    violently.  And that any time there's an emergency braking

9    activation, like, there's a potential that that train could

10   derail or come apart, like it did, in a pretty, like,

11   populated -- with neighborhoods and stuff around them.

12   Q    That train that decoupled, what was it carrying?

13   A    So it was what we would call a mixed freight train from

14   Portland, Oregon, heading to Vancouver, Canada, and it had

15   everything on it from lumber to industrial goods, as well as

16   hazardous materials.

17   Q    I'm going to show you a map that has been admitted into

18   evidence as Exhibit 32.

19       So this, I guess, dash line here, is that a railroad line?

20   A    Yes, it is.

21   Q    You mentioned a number of prior incidences.  Were some of

22   them along that line?

23   A    Yes, they were.

24   Q    Sorry.

25            THE COURT:  Thirty-two has been admitted, counsel.  You

1    may publish.

2          MS. JIANG:  There we go.

3    Q    Now that the jury can see it, that dash line that I just

4    asked you about, what is that?

5    A    That's the BNSF Bellingham Subdivision we call it.

6    Q    So that Bellingham Subdivision, you mentioned a number of

7    prior incidences.  Did any of them occur on that line?

8    A    Yes, they did.  The majority of them did.

9    Q    You mentioned that you received a camera-detection motion on

10   the night of November 28th.

11         That circle, do you see it?

12   A    Yes.

13   Q    I guess -- What does that indicate?

14   A    So that's in the area of where the camera was placed and

15   where this incident occurred.

16   Q    How often do trains run on the Bellingham line?

17   A    It can vary on -- by day, but it's a very frequently used

18   line for freight traffic and when operating passenger service

19   with Amtrak.

20   Q    Returning to the motion that you saw, I guess, what did you

21   see?

22   A    So, basically, the camera, when it detects motion, it takes,

23   like, a burst of photos and it transmits them via an app and you

24   get an e-mail alert or a text alert saying:  Hey, there's motion

25   by this camera.

1      So I opened my phone and observed -- I couldn't tell at the

2  time if it was multiple people, but definitely one person that

3  was walking on the tracks in this area.  And there was kind of a

4  blurry -- I couldn't really tell what it was -- to the right of

5  this person.  I thought it may have been somebody bent over or --

6  I really couldn't tell, but definitely a person.

7  Q    So I am going to show you what has been previously marked and

8  admitted as Exhibit 12, pages 13, 17, and 19.  So it's pretty

9  small, so let me zoom in on page 13 here.

10     Is this one of the images that you saw?

11 A    That's correct.

12 Q    In the lower left-hand corner here, it says, "32," I think,

13 "degrees Fahrenheit"; is that correct?

14 A    That is correct.

15 Q    What is that indicating?

16 A    So these cameras are primarily used for, like, hunting and

17 stuff, so it does capture what the temperature of the camera is

18 at the time, when it's transmitted, of where the camera is

19 placed.

20 Q    What time does this image show?

21 A    11:24 p.m.

22 Q    Is that consistent with your recollection that that was the

23 time that you received that?

24 A    That's correct.

25 Q    And is this a fair and accurate depiction of what you saw?

1   A   Yes.

2   Q   You mentioned there were a series of images.  Are the other

3   ones similar to what this one shows?

4   A   That's correct.

5   Q   Did you subsequently learn who the individuals were?

6   A   Yes, I did.

7   Q   Who were they?

8   A   Forgive me, the pronouncement, I'm not sure on the last name,

9   but the name was Ellen "Rei-ke" or "Rich," and Samantha Brooks.

10  Q   Now, you mentioned you received this alert at 11:24 p.m.?

11  A   That's correct.

12  Q   Do you normally work at that time?

13  A   As the supervisor for the area, I have officers that are out

14  patrolling all the time.  We keep/maintain 24-hour shift

15  coverage, so I'm kind of on-call all the time.  But during this

16  time, we had had some previous incidents that were going on over

17  Thanksgiving, so I was very closely -- I wasn't on duty per se,

18  but I was very closely monitoring my phone, even at 11:24 on a

19  Saturday night at home.

20  Q   What was your reaction when you saw that alert?

21  A   Felt that it was really odd and really suspicious for this

22  location.  Noting back to the temperature, it was cold out.  It's

23  November, it's Thanksgiving weekend.  I couldn't really tell from

24  the photo what was going on, but just from where the camera was

25  placed, this wasn't, like, a typical location where I had, like,

1   seen people that night or anything.  Like the camera would get

2   set off by trains going by occasionally, but the circumstances,

3   just the appearance, looked odd and suspicious to me.

4   Q    What did you do in response?

5   A    So I contacted the Whatcom County Sheriff's Office.  I knew

6   that I didn't have anybody on patrol in that area.  We had just

7   hired a new person who wasn't out on their own yet to cover the

8   Bellingham territory.  So I contacted Whatcom County Sheriff's

9   Office and requested that officers respond to that location to

10  further investigate.

11  Q    What did you do next?

12  A    After that, I got my work laptop and I opened a program

13  that's, like, the train dispatching system that you can see an

14  overview of the tracks -- it's called TMDS is what it's referred

15  to -- and I began monitoring that.

16  Q    What does TMDS do?

17  A    So it's basically a dispatch screen and it shows the tracks,

18  and it will show in realtime, like, if there's trains in the

19  area, what the condition of the signal system is.  Like, it

20  basically is an overview and a snapshot of how the trains are

21  actually dispatched at our headquarters in Fort Worth.

22  Q    All right.  One second.

23       So this has not been admitted yet.  Before I publish it to

24  the jury, could you take a look at the image on your screen?

25  This is Exhibit 12, page 16.

1          Is this a snapshot of the TMDS system that you viewed that

2     night?

3     A    Yes, it is.

4               MS. JIANG:  Your Honor, I would move for the admission

5     of page 16 of Exhibit 12.

6               MR. CANTOR:  No objection.

7               THE COURT:  Madam Clerk, it will be admitted.

8               THE CLERK:  Thank you, Your Honor.

9                    (Exhibit No. 12, page 16, admitted.)

10              THE COURT:  You may publish.

11    Q    What are we looking at here?

12    A    So this is a screenshot of the train, the TMDS dispatch

13    system.  So you can see the references on there where it says

14    "South-South Bellingham," "North-South Bellingham," "MP 98.7," so

15    on and so forth, the "Ferndale."

16         So, basically, from left to right, the top left, "South-South

17    Bellingham" would be the south end of that portion of this

18    display of the Bellingham Subdivision, and then on the bottom

19    right, it's just a continuation, where it goes to "Custer,"

20    "South Swift" and "North Swift."  That's heading north from that

21    location towards the U.S.-Canadian border.

22    Q    There is a section there that's red.  What is that

23    indicating?

24    A    From my experience in dealing with the other events from

25    this, so, basically, when a train would be occupying a section of

1    that area where it's displayed in white, like, it would

2    essentially be green and there would be a little arrow at the

3    front of it.  So it would indicate which way it was going, north

4    or south.  But, in this case, there's not -- Like, if above the

5    red, if there was a train there, it would display the train

6    symbol.  So it would say HPAS-VBC so it's a train going from

7    Pasco to Vancouver.  So, in this case, like, that's showing that

8    there's a track, what we call a track indication, that something

9    is occupying that track.  And we had been using the screen and

10   watching this screen to try and investigate or catch people from

11   the other incident.  So this would show that there's something

12   either on the rail or attached to the rail that's making the

13   signal system think that, hey, there's something here, you need

14   to -- Like, if there was a train coming, that train would need to

15   stop, if they didn't know what was causing it or what that -- But

16   it's basically saying, hey, this section of track is occupied.

17   Q    Okay.  So just to make sure I understand, so the red is

18   indicating that section of track is occupied?

19   A    Correct.

20   Q    Okay.  Was there a train in that area at that time?

21   A    No.  And you can see when it's white like that, they're

22   showing, like, no other activity in the area.  If there was

23   something on there, it would show up as occupied or green or

24   yellow/caution.  But there wasn't at this time.

25   Q    What inference did you draw from that?

1    A    So this section where it says Milepost 98.7, so the railroad,

2    like, it counts up, basically, going north.  So the next -- Like

3    I knew that this section of track was in the area where I had the

4    camera.  I knew the camera was placed in the area of 100.1'ish.

5    And those blocks are divided, I think in this one it's about two

6    miles long.  So I knew that, where it says 98.7 going north, it

7    was within that area where I had seen the camera activation, and

8    I was, like, this is clearly a track indication from something,

9    and I made the inference that it may have been caused by the

10   people that I saw on the camera.

11   Q    On the camera the night of November 28th?

12   A    Correct.

13   Q    Okay.  Looking at the lower left-hand corner, it seems to

14   show a date and time.  What time zone is that?

15   A    So the top one, where it says "11/29/20, 01:41:18," it's

16   based on Central Time, because that's where our dispatching

17   center is in Texas, on Central Time.

18   Q    Will you convert that to Pacific Time for us?

19   A    So that would be 11:41 p.m.

20   Q    And that would be on the night of November 28th?

21   A    Correct.

22   Q    What did you do next?

23   A    So I also contacted -- I was just basically waiting for

24   dispatch to get ahold of me.  I began -- When I say "dispatch,"

25   the Whatcom County Sheriff's dispatch.

1    I began trying to get my stuff on because I figured I would

2    have to respond up there just to see what was going on and waited

3    for that call from them.

4    Q   Did you go to the scene that night?

5    A   Yes, I did.

6    Q   What did you do when you arrived at the scene?

7    A   I contacted the deputies that were on scene there and just

8    kind of asked them what had been found, what was going on.  They

9    said they had the two people detained and that they had also ...

10   Q   Had something been found?

11   A   The deputies advised me that they had found a piece of wire

12   or a shunt.

13   Q   What did you do next?

14   A   As we progressed, we went down the tracks, located it, to see

15   where it was at.  It was just south of the location where I had

16   the camera placed.

17   Q   What did you see when you went to this area?

18   A   So you have to kind of get down to see, but I could see that

19   there was a piece of black wire that had the ends of it stripped,

20   exposing copper, and they were underneath the rail.  So if you

21   were looking down at it, you couldn't see; you kind of had to

22   angle down and look to the side of the rail to see where that

23   wire was running under what we call the ballast rock, the rock

24   bed that the railroad tracks are on.

25   Q   I am going to put up on the screen now Exhibit 12, page 18

1    and page 21, which were previously admitted.

2        Who took these photos?

3    A   I did.

4    Q   Let's start with the image on the top left.  On page, I

5    guess, 12-18, what are we looking at?

6    A   You can see the wire running in the rock ballast up towards,

7    on the underside of the track.

8    Q   So, I guess, why would the wire -- In your experience, why

9    would the wire run under the track?

10   A   In the incidents previous, they're really hard to find.  It

11   was like they were trying to conceal it.  The rocks would be

12   pushed over the wire.  And it's very hard to pinpoint, even with

13   the signal maintainers that are out there that know this stuff.

14   Like a lot of the time it was us on our hands and knees looking

15   underneath the rail, crawling the rail.  We kind of had a general

16   area pinpointed, but it was definitely trying to conceal so we

17   couldn't find the shunt.

18   Q   What's the condition of the rail on -- I guess, on the

19   underside?

20   A   I mean, it's steel rusty rail, but it's flat under there.

21   Q   Looking at the image on the lower right, I guess that's

22   12-21, what are we looking at?

23   A   So you can see in that photo the wire is buried there, it's

24   running underneath the rocks and going up underneath that part of

25   the rail.  You can see some of the copper wire fray.  As the

1  black wire comes up to the copper color, you can see some of the

2  wire frayed and sticking down there.

3  Q   So the rocks have been placed on top of the wire; is that

4  fair?

5  A   Yes.  Correct.  Yeah.  You couldn't push the wire under the

6  rock.

7  Q   Is the defendant a BNSF employee?

8  A   No.

9  Q   Is BNSF open to the public?

10  A   No.

11  Q   Are there signs warning people that BNSF property is private?

12  A   Yes.

13  Q   Did the defendant have permission to be on BNSF property that

14  night?

15  A   No.

16  Q   Did she have permission to place a shunt on BNSF railroad?

17  A   No.

18  Q   While you were out there, what else did you do?

19  A   After we photographed the wire, we collected the wire, we

20  looked for other stuff around to see if anything was -- any other

21  evidence was around, and we collected the wire, and then it was

22  eventually transferred.

23  Q   Okay.

24       MS. JIANG:  I am going to show the witness an exhibit

25  that has not been admitted yet.  It's 12-11.  I'm sorry.  I can't

1   seem to get rid of the one on the right.

2   Q   So, I guess, focusing your attention on 12-11, what is this?

3   A   So this is a screenshot that I took on my phone.  We have an

4   app.

5   Q   That's okay.  Hang on.

6           MS. JIANG:  I would move for the admission of this, I

7   guess 12-11.

8           MR. CANTOR:  I would ask for further foundation before I

9   respond.  At this point in time I'm objecting to foundation.

10          THE COURT:  The objection will be sustained, counsel.

11  More foundation.

12          MS. JIANG:  All right.

13  Q   What is this app?

14  A   It's an app that we use on our phones called "Get my LSMP,"

15  and that means line segment milepost.

16  Q   And what's the purpose of LSMP?

17  A   It's to get accurate readings of your location if you're out

18  on the tracks.  Like we use it when we're contacting people or

19  for reference of where we're at.  What it is, basically, it's

20  like GPS location.  So it overlays that to translate it into

21  subdivision, line segment, and then the milepost of that

22  subdivision.

23  Q   So it essentially tells you where you're at?

24  A   Correct.

25  Q   And you were standing where the shunt was located?

1    A    That's correct.

2    Q    Okay.

3              MS. JIANG:  I'd move for the admission now.

4              MR. CANTOR:  No objection.

5              THE COURT:  Thank you.  Madam Clerk, admitted.

6              (Exhibit No. Exhibit 12, page 11, admitted.)

7              MS. JIANG:  So I am publishing it for the jury now here.

8    Q    So looking at 12-11, what does "MP" stand for?

9    A    Milepost.

10   Q    And it shows there "100.319."  What's that telling us?

11   A    That's the milepost number of that section of track where I

12   was standing where the shunt was located.

13   Q    I'm going to show, I guess, the witness 12-15, which has not

14   been admitted yet.

15        What are we looking at?

16   A    That's the -- like, my location, the lat/long, I think, from

17   Apple maps on my phone.

18   Q    Okay.  It looks like a screenshot.  Did you take that

19   screenshot?

20   A    Yes.

21   Q    And what's the purpose of the screenshot?

22   A    Just to correlate, outside of railroad lingo, the location.

23   Not the line-significant milepost, but the latitude and longitude

24   of that location.

25             MS. JIANG:  I move for the admission of Exhibit 12-15.

1        MR. CANTOR:  No objection.

2        THE COURT:  Thank you.

3     Admitted, Madam Clerk.

4              (Exhibit No. 12, page 15, admitted.)

5        THE COURT:  You may publish.

6        MS. JIANG:  Okay.  So I'm publishing now.  It's on the

7   right-hand side.  I'm sorry I can't get rid of the one on the

8   left here.

9   Q   So referring you to 12-15, could you give us the latitude and

10  longitude?

11  A   Latitude shows as 48.778; longitude, -122.5401.

12  Q   One second.  I'm going to show you what has been previously

13  admitted as Plaintiff Exhibit No. 33.  It's on the right-hand

14  side here.

15      What are we looking at here?

16  A   This looks like a Google map overview of this area.

17  Q   That gray line that sort of runs from the top here and

18  curves down, what is that?

19  A   That's the BNSF Bellingham Subdivision.

20  Q   And that red marker right about there, what is that?

21  A   It looks in the general area of where this incident occurred.

22  Q   Okay.  Did you subsequently participate in the search of the

23  defendant's vehicle?

24  A   Yes, I did.

25  Q   What was the legal authority that permitted you to search her

1   vehicle?

2   A   I believe Whatcom County obtained a search warrant the

3   following day.

4   Q   Was there a cell phone in the car?

5   A   We did not locate a cell phone in the vehicle.

6   Q   Okay.  My final question:  What was the next train that was

7   scheduled to come through the area?

8   A   I believe the next train was a unit crude train, what we call

9   a crude-oil train, carrying oil to one of the refineries at

10  Cherry Point, which is east -- or, excuse me, west of Bellingham.

11  Q   I might be testing your memory, but do you know how many

12  cars?

13  A   Generally, if they're a unit crude train, there are around a

14  hundred cars of crude oil.

15           MS. JIANG:  No further questions.

16           THE COURT:  Cross-examination for this witness.

17           MR. CANTOR:  Thank you.

18                     CROSS-EXAMINATION

19  BY MR. CANTOR:

20  Q   Good afternoon.

21  A   Good afternoon.

22  Q   So is it "Neese," "Nice"?

23  A   "Neese."

24  Q   "Neese"?

25  A   Yes.

 1  Q    All right.  I will try to remember that.

 2       We talk about a track indication.  I know you mentioned that

 3  in your report, something called a track indication.  That's

 4  another way of saying that a block of track is occupied, correct?

 5  A    Correct.

 6  Q    And so when there is a track indication, what that will tell

 7  you is that that -- you know, that particular block will be in

 8  red?

 9  A    Correct.  Correct.

10  Q    And this idea of shunts, that is designed to interfere with

11  electrical currents, right?

12  A    Correct.

13  Q    And when the electrical current, this low-voltage electrical

14  current is running along the railroad-track block unimpeded, the

15  track will be clear, correct?

16  A    Say it -- Sorry.  Can you rephrase that?

17  Q    Okay.

18       There is a low-voltage electrical current that runs along the

19  track, right?

20  A    Correct.

21  Q    And that low-voltage electrical current is coming from a

22  power source?

23  A    Correct.

24  Q    And that power source is on a block of track, right?

25  A    Yeah.

1    Q    And the block of track can be, I don't know, a mile, two

2    miles, sometimes three miles long, right?

3    A    Correct.

4    Q    The purpose of communicating or the way to communicate with

5    the signals is through this electrical volts -- voltage that runs

6    through the track, right?

7    A    Yes.

8    Q    So if there's a train that's on the track and that train

9    short-circuits that electricity, that track will indicate

10   occupied?

11   A    Correct, yeah.  The wheels would complete that circuit, not

12   short-circuit it.  It would complete that circuit and show that

13   it's occupied.

14   Q    The wheels would essentially be a shunt?

15   A    Correct.

16   Q    Because the electrical current will not somehow go to this,

17   you know, I guess, the signals?  It will not communicate with the

18   signals that this electrical current is running through the

19   track; is that correct?

20   A    I don't know technically on that part as far as, like, how it

21   would communicate with that.  But, yes, when there is a train on

22   there, it would show occupied.

23   Q    To put it another way, there's no train on the track, right?

24   A    Correct.

25   Q    And you have this electrical current that's generating from

 1  this power source?

 2  A   Yes.

 3  Q   Do I understand it correctly that the block will show it's

 4  completely clear?

 5  A   Yes.  It would -- and on that screen that we spoke of, it

 6  would show, like, how the other sections were white, and that's

 7  how it would generally appear when we're looking at it.

 8  Q   Okay.  I think I understand.

 9      Now, I have a demonstrative exhibit that's marked as A-16.

10  It hasn't been admitted.  So I would like to show it to you

11  before we show it to the jury.

12      A-16, please.

13      All right.  So I could be wrong with this, but I just want to

14  see what your opinions are.

15      The graphic on the left, where it says "Unoccupied Track

16  Circuit," does that accurately reflect how a low-voltage-

17  generating electricity should run along the tracks when it shows

18  that it's clear?

19  A   I can't speak to that.

20  Q   You don't know?

21  A   I haven't seen this exhibit.  And I don't.

22  Q   Well, you are looking at it now, right?

23      So, on the left, there's, like, nothing interfering with the

24  electricity from that power source?

25  A   I don't know on this one.  Like as far as, like, this layout,

1    I don't.

2    Q    Well, it's a railroad track, right?

3    A    Okay.  Yeah, I understand it's a railroad track.  I just

4    don't -- Without further explanation --

5    Q    Right.

6    A    -- I don't know that I can speak on that.

7    Q    Well, there's a power source there, right?

8    A    It shows a power source.

9    Q    And a power source is needed to generate this electricity,

10   correct?

11   A    I don't know that.

12   Q    Didn't you just testify to that, that a power source

13   generates this electricity?

14   A    I testified that I'm not an expert on this.

15   Q    Okay.

16   A    But I'm going off of what you are saying that, yes, this is

17   the exhibit.

18   Q    A power source is needed to generate electricity, correct?

19   A    According to this exhibit, this is what it's showing.

20   Q    Electricity runs through the track, right?

21   A    Correct.  Yes.  That much I understand.

22   Q    Power is needed to generate that electricity, correct?

23   A    Yes.  Yes.

24   Q    Okay.  When that electricity is interfered with, there's

25   going to be an indication that the track is occupied, right?

1    A    I believe so, yes.

2    Q    That's precisely what the so-called wires are there for,

3    right?

4    A    Correct.

5    Q    To sort of trip that electricity?

6    A    Yes.

7    Q    Okay.  So one way, then, that a track can indicate that it's

8    occupied would be if there is no electricity that's going through

9    that track, right?

10   A    If there was like a power outage or something?

11   Q    Sure.

12   A    I don't know.  I would assume that if the power was out,

13   like, it would show something.

14   Q    Because that's what communicates with the signals, right, is

15   this electrical current?

16   A    Correct.

17   Q    So if there's a faulty power source, instead of showing that

18   the track is clear, it's going to show that it's occupied, right?

19   A    I don't know how it would display on that end in that

20   instance.

21   Q    Well, think about this logically for a second.  If the track

22   requires electricity to communicate with the signals and there's

23   a malfunction in that area, wouldn't the safe thing be to have

24   the signal say, hey, this is occupied, everything stop, right?

25   A    Correct.

1   Q   All right.  Which is why that if everything is moving the way

2   it should be, which is this electricity running through the track

3   totally clear, that's when you will see the green signal saying

4   everything is clear, right?

5   A   So just speaking from my experience in viewing, like, that

6   TMDS system, like, it doesn't go green unless the dispatcher,

7   like, on there gives them that clearance.  So that's why, when I

8   was explaining that it was white on the screen, that's when we

9   look at it and see that it shows unoccupied as white.  So it's an

10  odd kind of way to explain that, I guess, but it's just white on

11  the screen.  In general, if there's a train going and they had

12  green lights, like in a traffic-signal sense, the sections of

13  track would appear as green on that screen.

14  Q   When a train is on the track, the train interferes with that

15  electrical current?

16  A   Or -- I don't know if it's interferes or if it's, like,

17  working in conjunction with how it's set up on the dispatch side.

18  Q   But it's simply because of that that -- because of this

19  interruption of electrical current, because the train is on it,

20  it will communicate to the signals that that block is occupied,

21  right?

22  A   Yeah, I can assume that.  Yes.

23  Q   Okay.  So I guess my question is, and that is, if there is a

24  disruption or a malfunction with the power source that generates

25  that electricity, that too would also tell the signal systems

1    that the block is occupied; isn't that correct?

2    A   I don't know what the fail-safes are on that case.  Like, I

3    don't know how that would appear if there was, like, a power

4    outage in that instance.

5    Q   Or if there was any kind of disruption of the electrical

6    current, you wouldn't know how that would affect the signal

7    systems?

8    A   I mean, you're speaking on, like, a whole level?

9    Q   On the --

10   A   What I'm seeing is, like, on the screen that I was referring

11   to, like, it very clearly turned red, and with how we had been

12   investigating this, that was the indication, that there was a

13   track indication that something was occupying that.  But I don't

14   know about the overall view of how that would appear, if there

15   was some type of power loss, and what that would look like in

16   that interruption.

17   Q   Well, there's certainly no train on the track at that time,

18   right?

19   A   Correct.

20   Q   So there must have been something that was interfering with

21   the electrical current, right?

22   A   And that was my assumption.

23   Q   That was your assumption.  That would explain why it's red?

24   A   That was my understanding, yes.

25   Q   Right.

1        And, similarly, for example, you're familiar with slump

2    detectors, right?

3    A    Yes.

4    Q    Slump detectors measure ground movement, right?

5    A    That is my understanding of it from previous incidents.

6    Q    Well, it's in your report.  I mean, do you want me to ...

7             MR. CANTOR:  We will just pull up your report at --

8    don't show it to the jury -- but it's at page 874, page 4.  Bates

9    874, page 4.  And let's go to the fifth paragraph.  Just kind of

10   blow that up.

11       No.  The fifth paragraph.  No.  The fifth paragraph.  There

12   you go.

13   Q    You talk about slump detectors in your report, right?

14   A    Yes.

15   Q    Slump detectors measure ground movement?

16   A    That's -- Yes, that's how it was explained, with a previous

17   incident that happened, like showing a slump, if there's a slump

18   detector in the area, that there's some type of sinkhole or

19   landslide.  That was my understanding of how it was explained to

20   me.

21   Q    And your understanding, based on that information, is that if

22   this thing triggers, that will also occupy or show that the block

23   of track is occupied?

24   A    Correct.

25   Q    I mean, for example, this is Bellingham, right?  And it gets

1    some pretty harsh weather in the wintertime, right?

2    A    Yes.

3    Q    Like in November, especially late November, there's a lot of

4    rain, right?

5    A    Yes.

6    Q    And it's not uncommon for there to be landslides along this

7    corridor, correct, or mudslides?

8    A    In certain parts, yes.

9    Q    All right.  And that's why you have these slump detectors

10   there?

11   A    Yes.

12   Q    Because if there's a mudslide, you are going to want to know

13   about it so that way the block signal shows that it's occupied?

14   A    Correct.

15   Q    So that way your train doesn't go through there?

16   A    Yes.

17   Q    So, again, if there's a problem with the power source that

18   controls all of this, wouldn't you agree that the block would

19   also show that it's occupied?

20   A    I would assume that the train traffic would be held.  I don't

21   know how it would appear on the dispatch screen from a power

22   loss.  Like if the entire subdivision would go red, I don't know

23   that.

24   Q    Well, the power source that controls that low-voltage

25   electrical current, you wouldn't know if that would also trigger?

1    A    I don't know how it would appear on the screen and what it

2    would show to the dispatcher and how that would be handled.

3    Q    All right.  In any event, you became involved with this case

4    on November the 28th, right?

5    A    I was involved in much of the overall stuff.  But, yes, I was

6    involved on November 28th.

7    Q    Specifically at 11:24, or thereabouts, you get notification

8    that there is something going on on the tracks, right?

9    A    Correct.

10   Q    Specifically along the Cliffside Drive portion of the

11   railroad tracks, right?

12   A    Correct.

13   Q    And you know that because of these motion-activated cameras?

14   A    Correct.

15   Q    What you receive from this motion-activated camera is you

16   receive images of trespassers?

17   A    Correct.

18   Q    And I have your report here, so if you want to refresh your

19   memory on some things, I'm happy to bring it up.

20   A    Yeah.

21   Q    You notice, at least from what you are seeing on this camera,

22   you see someone kneeling; is that right?

23   A    I couldn't exactly see -- I can't remember how I referenced

24   it in my report, if you wouldn't mind just pulling it up.

25   Q    Sure.

1    A    But I definitely saw a person standing and then I couldn't

2    tell what the other image was.

3    Q    Okay.  Let's go to 876 of page 6, the last paragraph.  You

4    indicate that you notice what appears to be another person

5    kneeling on the tracks, right?

6    A    Correct.

7    Q    Okay.  And at some point you also arrive at the scene.  I

8    mean, you get this notification, you get these images on your

9    camera, and you do something about that, right?  You contact

10   Whatcom County Sheriff?

11   A    Correct.

12   Q    And to your knowledge, you know, within minutes, they are

13   there on scene, right?

14   A    I believe so, yes.

15   Q    And you're in constant communication with them about what

16   you're observing?

17   A    I mean, I think I waited, I can't remember exactly, to hear

18   from dispatch, not to bug the dispatchers, but -- But, yeah,

19   speaking to figure out what's going on.

20   Q    Right.  And it's at about this time that you turn on the, if

21   I can get it right, the TMSD {sic}, train management dispatch

22   system; is that right?

23   A    Correct.

24   Q    The TMSD {sic}, right?

25   A    TMDS.

1    Q    Oh, TMES.  Okay.

2    A    D-S.  Train management dispatch system, TMDS.  Tom Mary David

3    Sam.

4    Q    All right.  The train management dispatch system, you turn

5    that application on on your laptop?

6    A    Correct.

7    Q    And, according to your report, it's about at that time you

8    see a track indication appear and then disappear?

9    A    Correct.

10   Q    All right.  So after it appears and then it disappears, you

11   also are in communication with Whatcom County Sheriff?

12   A    Correct.

13   Q    All right.  And shortly thereafter, or at some point -- I

14   don't know exactly when -- but soon thereafter, you yourself make

15   a trip to the Cliffside Drive crossing?

16   A    Correct.

17   Q    And you communicate with the sheriff officers that are on

18   scene, right?

19   A    Correct.

20   Q    And you learn that they found a piece of wire?

21   A    Correct.

22   Q    And you learned that they found a piece of wire in the area

23   where this person was seen bent down, or these two people were

24   seen bent down on the track?

25   A    Correct.

1    Q    All right.  This would be in the same area where you saw them

2    apparently kneeling on the track, right?

3    A    Yeah.  From what I referenced in my report, yes.

4    Q    Okay.  So you're able to see them kneeling on the track on

5    the camera, correct?

6    A    I don't know if I was clear in that.  It appeared -- Like, I

7    couldn't tell exactly what that -- to the right of the photo,

8    whether it was somebody knelt down or what it was.  I think I

9    referenced that in my report, though.

10   Q    But that's the area where they found the wire?

11   A    A little bit south of there.

12   Q    But you say in your report -- Let's just go to your report

13   for a second.  Let's go to page 877 of page 7.  Let's go to

14   the -- one, two, three -- third paragraph.

15        I mean, the wire was found in the area where these two

16   trespassers were seen bent down on the tracks, right?

17   A    In the general area of that, from Cliffside to where the

18   camera is, yes, like ...

19   Q    Now, let's talk about what happened when the wire was

20   eventually collected.

21        Did you have anything to do with collecting this wire that

22   was found under the ballast of the tracks?

23   A    Yes.

24   Q    And the ballast, to be clear, these are rocks, right?

25   A    Correct.

1   Q    It's the rocks that are in between the two rails?

2   A    Yes.

3   Q    All right.  And you collected that.  You didn't keep custody

4   of that wire, did you?

5   A    I can't remember exactly what the chain of custody was.  I

6   think we transferred it at some point to the federal officers

7   that were working.

8   Q    That was going to be my next question.

9   A    Yes.

10  Q    I mean, you didn't keep it in your evidence; you instead

11  turned it over to the FBI?

12  A    Correct.

13  Q    Because they wanted it?

14  A    Correct.

15  Q    Are you familiar with a short detector?

16  A    Yes, somewhat.

17  Q    Have you ever used one?

18  A    I haven't used it personally.  I was with many of the signal

19  maintainers that were using that to locate the shunts.

20  Q    Okay.  So that was going to be my next point.  And that is, a

21  short detector, what is that exactly?

22  A    From my understanding, it detects shorts.

23  Q    Shorts, like what you wear or what?

24  A    Like electrical shorts.

25  Q    Electrical shorts.

1        Electrical shorts that run along the track, right?

2   A    I don't know if these ones are specific to the railroad, but

3   I know there's, like, short detectors in general.

4   Q    It's a tool that's specifically for the purpose of detecting

5   whether this electrical current is actually running along the

6   railroad, right?

7   A    I guess.

8   Q    I mean, if you don't know, you don't know.

9   A    Yeah, I don't know.  I mean, I assume that's what it was when

10  they were using it.

11  Q    All right.  And from what you understand, the short detector

12  is used to look for shunts?

13  A    That's how it was used, in my experience with it, in this

14  case.

15  Q    Okay.  So you do have some experience with these short

16  detectors?

17  A    Yes.  I mean, as an observer riding along in the truck

18  or walking as they were touching the rail with this detector

19  to ...

20  Q    As far as you know, though, no short-detector instrument was

21  used in this particular investigation on November 28th and 29th,

22  right?

23  A    Not that I recall.

24  Q    You talked about, I guess, the earlier investigation where

25  this freight train decoupled or there was some sort of damage to

1    the train?

2    A    Yes.

3    Q    And there's a difference between decoupling and what happened

4    in that particular instance, right?

5    A    Yes.  Yes.

6    Q    Okay.  If I understood what you said, what happened on

7    October 11th or October the 12th, was the draw bar got damaged?

8    A    Correct.

9    Q    But the train didn't really decouple, did it?

10   A    The train came apart, yes.

11        So I would say, like, if you are picturing a train car where

12   the knuckles come together, for reference --

13   Q    Yes.

14   A    -- so, like, that would be any kind of decoupling; like if

15   somebody pulled the pin out, the pin that holds them together,

16   that would be decoupling.

17        The drawbar is like the beefier thing that holds the knuckles

18   into place, and like it did get ripped out of, like, one of the

19   ends of the rail car and caused the train to separate.

20   Q    It did not get detailed, did it?

21   A    It did not derail.

22   Q    All right.  And were you part of the team that collected

23   evidence in that investigation?

24   A    I just took phone reports on that.  I didn't respond to the

25   scene on that one.

1    Q    So you didn't even see what was discovered or not?

2    A    I didn't go to the scene on that one.

3    Q    Were you aware of how many shunts were found?

4    A    I believe that was relayed to me from the signal maintainer

5    up there.

6    Q    And to your knowledge, were there two shunts that were found?

7    A    I can't remember what was referenced in the report, but -- in

8    that incident.

9    Q    To your knowledge -- Well, during your investigations of

10   these shunts, is it common to find quarter-size magnets?

11   A    Yes.

12   Q    And the reason why that's common is because magnets are what

13   actually connects the frayed part of the wire to the rails?

14   A    Correct.

15   Q    And I guess the railroad track itself is magnetic, correct?

16   A    Well, it's steel, yes.  So, yeah, you could put a magnet on

17   it.

18   Q    Right.  Okay.

19        And to your knowledge, that October 11th -- that October, I

20   guess, 11th and 12th incident, two magnets were found, correct?

21   A    I would have to reference my report.  But in most of the

22   incidents, those magnet were found.

23   Q    No magnets were found in this case, were there?

24   A    That's correct.

25   Q    Getting to the crossing arms, you talked a bit about how

1    shunts interfere with crossing arms, and I want to see if I

2    understand this.

3        So the shunts can only interfere with crossing arms if they

4    are within a certain distance of the crossing arms; is that

5    right?

6    A    I reference in my report, from the information provided to me

7    from our signal department, how they would call it shortening the

8    crossing.  That is what they reference in it.  And I'm not an

9    expert on that.  That's just the information that was given to me

10   from our signal department.

11   Q    So if a shunt is placed, say, like a mile to the north of a

12   railroad crossing where the arms are, a shunt is placed like a

13   mile or even two miles to the north or to the south -- it doesn't

14   matter -- two miles away, you would agree that that shunt would

15   not interfere with the railroad crossing arms, correct?

16   A    From my understanding, it has to be within what they call the

17   "crossing approach," from what was explained to me from our

18   signal department.

19   Q    And from all of our common experience, including yours,

20   right, when a train gets close enough to the railroad crossing,

21   those arms are going to activate, right?

22   A    They should, yes.

23   Q    Yes.  Okay.  I mean, we have all been there, right --

24   A    Yes.

25   Q    -- where we see it coming and then, ten seconds later,

1   there's a train?

2   A    Yes.

3   Q    So that also has to do with the train sort of serving as a

4   shunt to that electrical current that we're talking about, right?

5   A    If -- I'm not 100 percent, like, up on that, how that all

6   goes, but --

7   Q    Okay.

8   A    -- it just depends on how the crossings -- Some of the

9   crossings, I don't know their -- the design.  And in that

10  approach, as they get -- it's based on time and distance, speed.

11  There's machinery that calculates to make sure that they drop in

12  time for whatever the standard -- the federal standard set is.

13  Q    But there's got to be something that communicates with the

14  railroad signals to cause the arms to go up and down, right?

15  A    Yeah.

16  Q    It's not like it's the train engineer that pushes a button?

17  A    Correct.

18  Q    So if a shunt that interferes with the electrical current is

19  placed within a certain distance of that crossing arm, that's

20  what can cause the crossing arm to activate, even though there's

21  no train around?

22  A    Yes, if it's very close, within, like, a certain area.  It

23  depends on the crossing, of how they're set up and the

24  construction of it.  But that will vary from the -- like the

25  calls that I have seen that happen, where they have been down,

1  yes.

2  Q   But there are also instances where the crossing arm is just

3  not functioning, right, regardless of whether -- I mean, there

4  may not even be a shunt; they just malfunction for --

5  A   Like they're just down and, like, there's no train coming?

6  Q   Sure.  They are just down or they won't go down.  There's

7  just some other electrical malfunction that prevents them to

8  activate?

9  A   Yes, that could happen.

10  Q   Okay.  There's something called, like, an activation failure

11  report.  Are you familiar with something like that?

12  A   That's not within my scope.

13  Q   Okay.  Well, what's your title again, BNSF what?

14  A   Deputy Chief of Police.

15  Q   Deputy Chief of Police.  All right.

16      So if there is a malfunction of some important piece of

17  equipment like a crossing arm, you're not in any way responsible

18  for documenting that, are you?

19  A   We will get notified sometimes on that from, like, the local

20  agency that says, hey, the gate arms are down in Kent or

21  something, and they will contact our police dispatch.  But that

22  generally goes to a call tree that will go to the signal

23  department to address that.

24  Q   But part of your duties and responsibilities, they don't

25  involve filing any kind of reports to document failures?

1    A    No.

2    Q    That would be someone else?

3    A    Yes.

4    Q    Okay.  I understand.

5         In this particular instance, though, when you went to this

6    Cliffside Drive crossing, you have no information about whether

7    these crossing arms operated or not on November 28th and 29th,

8    correct?

9    A    As far as prior to that or --

10   Q    During this whole thing, like from, say, starting at

11   11:24 p.m., when you saw the trespassers for the first time,

12   through the moment in time you arrived when they were, you know,

13   arrested?

14   A    I didn't obtain that information.  I requested that our

15   signal department do a download of that for their stuff, but ...

16   Q    So you have no independent knowledge of whether those

17   crossing arms were somehow affected by that one piece of wire

18   that was recovered in that area?

19   A    Not specifically, no.

20   Q    Okay.  Now, the milepost markings.  I want to go to that

21   exhibit.  I think it's 12-11, but what I will do is I will just

22   pull it up from our discovery because it's the same thing.  It's

23   already been admitted.  So it's at Bates 881, page 11.

24            MR. CANTOR:  Because this has been admitted, I would ask

25   that we publish it.

1          THE CLERK:  Counsel, what's the number?

2          MR. CANTOR:  So this would be Government's

3    Exhibit 12-11.  I'm just referencing it from my discovery, which

4    is Bates 881 at 11.

5    Q    All right.  So this is Government's Exhibit 12-11, which has

6    been admitted.  And this is the LSMP App that you used on

7    November the 28th, right?

8    A    Correct.

9    Q    Okay.  So if I'm understanding this application correctly,

10   you go to a specific location, you stand at that location, you

11   turn this thing on, and it will tell you where you are?

12   A    Yes.

13   Q    Okay.  You would agree, though, that this is not GPS

14   accurate, correct?

15   A    I don't -- I don't know.  I mean, it's pretty close from --

16   Like, when we're using it in reference to -- Like it gets you to

17   the milepost of where it would be at in the -- like, on the

18   subdivision.

19          So I don't -- I can't speak to the specifics of the app and

20   how it works, but if I'm trying to find a location on our tracks

21   and I need to know the milepost, this is what I would use.

22   Q    But my question is, you would agree this is not GPS accurate?

23   A    I'd assume that it works off of GPS in order to find you.

24   Because I have used it -- If you are standing too far off the

25   tracks, it will tell you, like, you're not within that track

1   range.  So, like, if you're 100 feet off the tracks, you would

2   need to stand on the tracks, and then it will give you that

3   location.  So I assume that there's some type of GPS that it uses

4   to find your location.

5   Q   This tells us that this is not PTC-compliant, correct?

6   A   Yes.

7   Q   PTC is positive train -- What does it stand for?

8   A   Control.

9   Q   Positive train control, right?

10  A   Yes.

11  Q   That's GPS controlled, correct?

12  A   Portions of it are, yes.

13  Q   It goes on to say that if you want GPS accuracy, you have got

14  to use a Trimble R1 unit, correct?

15  A   That is what it says on there.

16  Q   You didn't do that?

17  A   I don't -- I don't know what that is.

18  Q   Okay.  All right.

19        MR. CANTOR:  One moment.  I think I might be done, but I

20  just want to check with my partner here.

21      Okay.  I have no further questions.  Thank you.

22        THE COURT:  Thank you very much, counsel.

23      Ms. Jiang, any redirect for this witness?

24        MS. JIANG:  Just a couple, Your Honor.

25

1                   REDIRECT EXAMINATION

2    BY MS. JIANG:

3    Q    Mr. Nies, did you help with the investigation in this case?

4    A    Yes.

5    Q    To your knowledge, was there a power outage that night?

6    A    Not that I was aware of.

7    Q    To your knowledge, was there a landslide?

8    A    No.

9    Q    To your knowledge, did the railroad signal system malfunction

10   in any way?

11   A    The track indication occurred, but, no, nothing that I saw

12   from that night or heard of from that night.

13   Q    You mentioned that the track indication occurred.  In your

14   experience, what does that mean?

15   A    It meant something was placed on the tracks, a shunt was

16   placed on the tracks.

17   Q    Thank you.

18            MS. JIANG:  No further questions.

19            MR. CANTOR:  No further questions.

20            THE COURT:  All right.  Mr. Nies, thank you.  You are

21   free to step down.  You are free to go.

22            THE WITNESS:  Thank you.

23            THE COURT:  And the government may call their next

24   witness.

25            MR. KOPCZYNSKI:  Your Honor, the government calls Eric

1    Shaffstall.

2         THE COURT:  Mr. Shaffstall, if I could have you work

3    your way through the center of the courtroom, come up in front of

4    my clerk, right in front of me, raise your right hand to be sworn

5    prior to testifying.

6                    ERIC SHAFFSTALL,

7         having been sworn under oath, testified as follows:

8         THE CLERK:  Thank you.  Please have a seat.

9       Can you please state your name for the record and spell your

10   last name for our court reporter?

11        THE WITNESS:  Yes, I will.  My name is Eric Shaffstall,

12   S-h-a-f-f-s-t-a-l-l.

13        THE COURT:  Mr. Shaffstall, a couple of real quick

14   instructions before we begin.  Because the jurors get to observe

15   the witness and also their demeanor and everything, do you feel

16   comfortable removing your mask while you testify?

17        THE WITNESS:  Yes, sir, I do.

18        THE COURT:  All right.

19       And then, secondly, please listen carefully to counsel's

20   question.  Do your best to answer that question.  Don't speak

21   over counsel because that makes it impossible for our court

22   reporter to track, all right?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  If you don't understand something, just say

25   so; I will try to get them to clarify for you.

1          THE WITNESS:  Okay.

2          THE COURT:  All right.

3      You may inquire.

4          MR. KOPCZYNSKI:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6  BY MR. KOPCZYNSKI:

7  Q    Good afternoon.

8      Mr. Shaffstall, where do you work?

9  A    I work for BNSF Railway.

10 Q    How long have you worked there?

11 A    Twenty-four years.

12 Q    That's quite a long time, but if you could, give us sort of

13 the high-level overview of your 24 years at BNSF.

14 A    Sure.

15     I was hired in 1996 to work on a construction crew for the

16 signal department.  I did that for two years -- a year and a

17 half.  And I took a job as an electronics technician out of

18 Wenatchee, Washington.  I stayed there from 1998 through 2005,

19 when I took an identical position at Tacoma, Washington.

20     In 2007, I stepped into management and took a job in Seattle.

21 I worked in Seattle as a signal supervisor from 2007 until 2011.

22 In 2011, I took a job at the signal engineering office in Lenexa,

23 Kansas.  There, I was a signal engineer, systems safety.  That

24 is, I was a quality assurance engineer.  I checked the designs of

25 crossings, signal systems.  Everything that was going to be

1    built, when I signed off on its correctness, then it would go out

2    for construction.

3        I stayed there from 2011 until 2020, when I came back out to

4    Washington State, again as an electronics technician, this time

5    out of Everett.  I did that job for six months, and an

6    opportunity to work as a supervisor came open again, and I'm

7    currently the supervisor at Everett for the signal department.

8    Q    Okay.  Thank you.

9        So a couple of questions about that career history.  First,

10   did you have training or experience before you started with BNSF

11   in any of the concepts and responsibilities you would be working

12   with?

13   A    I was an electronics technician prior to my time at BNSF.  It

14   was consumer electronics, not railroad electronics.  But I was

15   familiar with the principles of electronics.

16   Q    Okay.  And then when you started at BNSF in 1996, and going

17   forward, did you have regular on-the-job opportunities to learn

18   about and become familiar with the systems you're working with,

19   like the railroad signal system?

20   A    Yes, sir.  We have a journeyman -- Well, we have an

21   apprentice system first, and then as a journeyman we have

22   continuing education, journeyman classes, plus just on-the-job

23   work.  I worked on the maintenance team, and so it was my job to

24   aid in the maintenance of the system.  So I have worked day

25   in/day out with it for decades.

1    Q    Right.

2         And, in fact, you said for roughly a nine-year period in

3    Kansas, your job was to sort of quality check the engineering

4    work on signal and crossing systems; is that right?

5    A    That is correct.

6    Q    And you did that for nine years?

7    A    Yes.

8    Q    So you would look at the design of these systems and you

9    would make sure that it's all done properly and safely; is that

10   right?

11   A    Yes, sir.  I would look at the whole project from sort of,

12   you know, 10,000 feet and see how the whole system worked and

13   then check every program, every piece of wire, everything for

14   every location on paper before it was sent out for construction.

15   Q    Okay.  And I've heard you say a couple of times referring to

16   the word "engineer."  One quick thing is, in your field, do you

17   have different types of engineers?  Because I might think of,

18   like, a train engineer as someone actually on the train,

19   operating the train.  Help sort that out.

20   A    Right, right.

21        So there's -- The person driving a train is also called an

22   "engineer," but that's not the type of engineer I was.  I was a

23   design engineer, where we were planning signal systems, crossing

24   systems, positive train control systems.  The pencil engineer,

25   not the driving engineer.

1    Q    Good.  Okay.

2         So I want to talk about all of those things.

3              MR. KOPCZYNSKI:  And, Your Honor, I would offer

4    Mr. Shaffstall as an expert in rail signal systems and these

5    other related systems.

6              THE COURT:  Any objection by the defense?

7              MR. SANDERS:  No objection.

8              THE COURT:  Thank you.  He will be accepted.

9    Q    So, Mr. Shaffstall, first, about railway signal systems, what

10   are the primary purposes of a railway signal system?

11   A    The primary purpose is to increase the efficiency of the rail

12   network while maintaining or exceeding the safety we can achieve

13   without a signal system.

14   Q    So let's break that down a little bit.  You have the railway

15   network.  So for BNSF, what is that?

16   A    Oh, it's -- I don't know how many thousand miles.  We're over

17   quite a few states.  I think we're the largest rail network in

18   the country.

19   Q    And so you have trains moving all over that network, across a

20   large portion of the country?

21   A    Yes.  Yeah.  Most of the states.

22   Q    Okay.  And so you said a signal system helps increase

23   efficiency on that system while being safe.  So does one part of

24   the signal system track trains on the network?

25   A    Yes.  Where we have -- In most of the areas where we have

1    signalized track, we also have what's called CTCs, a centralized
2    traffic controller.  The locations in the field are in constant
3    radio communication with our dispatch office in Fort Worth, and
4    it, in effect, can track a train across the system.
5    Q   Okay.  Now, as you track trains, you mention moving
6    efficiently over the network, but sort of on the flip side of
7    that equation, what are consequences or what are things you're
8    hoping to avoid as the trains move over the network?
9    A   Well, naturally, safety is our primary concern.  We want to
10   avoid circumstances where a train would have the potential to
11   come in contact with another train.
12   Q   So collisions?
13   A   Yes.  That's our primary safety concern there.  We want it to
14   be as safe for our employees as possible.
15   Q   Okay.  You also mentioned, though, you have done work on
16   railroad crossings?
17   A   Yes.
18   Q   So is that another component of your safety?
19   A   Yes.  There we're talking about the safety of the public.
20   And so, yes, we try to design our crossings to be as safe as
21   possible for the motoring public.
22   Q   Okay.  So back about the signalling system then,
23   understanding that purpose of it, what are the, like, physical
24   components of a railroad signal system?
25   A   Right.

1        So there was a way to draw; is that correct?

2    Q   That would be great.  Let's clear this.

3            MR. KOPCZYNSKI:  And then I could show the witness the

4    tools, or I don't know if you want me to approach, but to allow

5    him to make some drawings with his finger.  Would you like me

6    to --

7            THE CLERK:  No.

8            THE COURT:  Yeah.  I'm sorry, counsel.

9        Mr. Shaffstall, the screen is interactive.

10           THE WITNESS:  Okay.

11           THE COURT:  And you can actually use your finger or use

12   the little stylus there.

13           THE CLERK:  There should be a stylus right there.

14           THE COURT:  That might be better.

15           THE WITNESS:  Oh, yes, I see a stylus.

16           THE COURT:  You can draw on the screen, and if counsel

17   has got it set up correctly, the jurors should be able to follow.

18           THE WITNESS:  Okay.  All right.

19   Q   So let's get us all on the same screen and then maybe just,

20   in the corner, give us a little test mark.

21   A   Got it.

22   Q   Okay.  We're all on the same page.

23       So I had asked you if you could explain for us the components

24   of the railroad signal system.

25   A   Yeah, I can, in brief.

 1      Our signal system is divided into blocks.  It's a block
 2   signal system.  And a block is a segment of track, nominally two
 3   miles in length.  They vary quite a lot based on geography and
 4   the layout of a city.  There's any number of reasons to be a
 5   little bit more or less than two miles.  But, in general, it
 6   takes between one and two miles to stop a train, so a two-mile
 7   block is best for us.
 8      So if you could imagine, miles and miles and miles of track,
 9   we would have it divided into blocks.  And we have a signal
10   governing movement into each of those blocks, and each of those
11   blocks, as I said, is about two miles in length.
12      So only focusing on this signal for a moment, to make it
13   easy, in order for this signal to display to the train
14   information that allows them better than stopped, we would have
15   to know that this first block is clear.  We would not want a
16   train to enter that block unless that block is unoccupied.  So we
17   can give a train a red if that is blocked, or if it's not
18   occupied, we'd give a train a yellow.
19   Q   So what does yellow mean?
20   A   I'm sorry.  I should explain that.
21      That is, the yellow signal indicates to the train that they
22   will stop at the next signal.
23   Q   So yellow would mean not the immediate next block but one
24   block later is occupied?
25   A   Yes.  Yes.  So --

1   Q   When you talk about red and yellow, do you mean physically

2   lights there on the track that the train engineer would see?

3   A   I do.  I do.

4       The signals are very much like traffic signals.  We have four

5   aspects that we display.  We do a red, yellow, flashing yellow,

6   green.

7       Red is, of course, stop.  Everybody gets it.  Yellow informs

8   the train that they will stop at the next signal.  The flashing

9   yellow tells them that they will stop two signals out, so they

10  can begin braking this heavy train early.  And a green means that

11  they can operate at maximum-authorized speed in that segment of

12  track.  They will have a book to look up what that speed is.

13      So with this first block occupied, they could only get a red.

14  They would have to stop because the block is occupied.

15  Q   You're saying if a train was coming from the left of the

16  screen --

17  A   Yes.  Yes.

18  Q   -- the --

19              (Reporter interruption due to overtalk.)

20  Q   My question was:  Are you explaining if a train is moving

21  from the left to the right and it encounters that first signal

22  you drew?

23  A   Yes.  Yes, sir, I am.

24      So a train proceeding from left to right would have a red

25  signal at the first signal if the block on the other side of that

1   signal is occupied.  If that block was unoccupied, but the next

2   one was occupied, it would get a yellow signal.  I can't erase,

3   but I can scribble that out.

4       If two blocks were unoccupied, but the next one was occupied,

5   we would get a flashing yellow signal.  And if all three of those

6   blocks are unoccupied, I can give a green signal to that train

7   and it can operate at its maximum-authorized speed.

8   Q   So the signal system is always looking ahead at least three

9   blocks?

10  A   Yes.

11  Q   And remind us, how far, as a rough rule of thumb, is each

12  block?

13  A   About two miles.

14  Q   So how far is the signal system, roughly, looking ahead?

15  A   It's always looking out about six miles in advance of the

16  train.

17  Q   And you started to touch on this a little bit, but what does

18  the train engineer do as he or she sees, for example, a yellow or

19  some other signal -- I think you are calling them "aspects" --

20  A   Yeah.

21  Q   -- some other color on the signal?  What does the train

22  engineer do with that information?

23  A   So if the train engineer were to view a green signal, they

24  would continue to run at their maximum-authorized speed.  When

25  they encounter a flashing yellow, they would begin the braking

1   process, they would begin to slow the train down.  Excuse me.

2   When they view a yellow, they would actually begin to now brake

3   the train, planning to stop before passing the next signal, which

4   they now know is going to be red because they just received a

5   yellow.  It's a little advanced warning for them.

6   Q    Okay.  So you have mentioned some of the ways this resembles

7   auto traffic out on the roads, but in some ways it doesn't.

8        And so why is it different?  Why are you essentially allowing

9   one train per block?

10  A    Yeah.  So it is in some ways very much like traffic signals,

11  but the traffic signal you receive when driving doesn't convey

12  any information to you about the segment of road you're about to

13  enter.  But your car could stop in a very short span and a train

14  cannot.

15  Q    Why can't a train not stop in a short span?

16  A    They're just very massive.  It's a lot of weight.  They have

17  a lot of momentum.  It takes, you know, one to two miles to bring

18  a train to a stop.  So we have to know that the segment of track

19  immediately in advance of the train is unoccupied before the

20  train enters that block.

21  Q    Okay.  So it's been a while since I took anything around

22  physics, but if I understood what you just said is that a train

23  is so massive --

24  A    Yeah.

25  Q    -- that that's, what, from full speed to a stop?

1   A    Yes.

2   Q    -- can take how long?

3   A    It's usually between one and two miles.  It varies quite a

4   bit based on the makeup of the train.

5   Q    Okay.

6   A    But rule of thumb, about one mile to two miles.

7   Q    Okay.  So understanding then, trains stay out of the same

8   block?

9   A    Yes.

10  Q    How does the signalling system know that a train is in a

11  block?

12  A    Well, yeah.  So we have a low-voltage signal that we pass

13  down the rails.  The rails are made of steel.  They are

14  conductors.  At the end of each block, we have an electrical

15  termination, if you will, something that prevents the current

16  from travelling from one block to the next, and we use the

17  presence of that signal to say that the train -- that the track

18  is unoccupied.  So we operate on a fail-safe system.  That if the

19  voltage is present, there's no train in the block.

20  Q    Okay.  A couple of questions about that.  First, voltage.  Is

21  this voltage like if I touch the rail, I get a shock?

22  A    It's very low voltage.  Only a couple volts.  No more than --

23  Less than a nine-volt battery.  It's --

24  Q    So it wouldn't even conduct through a person?

25  A    No.  No.

1    Q    But your systems detect it?

2    A    Yes.  Yes.  You could measure it with a meter, but you would

3    never be able to feel it.

4    Q    Okay.  And so, as you said, from one block to the next, if

5    the voltage makes its way all the way, did you say that it's

6    open?

7    A    Yeah, basically.  If the current is passing down the rails,

8    then nothing is in that block.  Maybe I should explain this.

9         Trains are meant to intentionally short the current in the

10   rails.

11   Q    So that was my next question --

12   A    Yeah.  The wheels and axles of the car --

13   Q    -- when a train is --

14        MR. KOPCZYNSKI:  I'm sorry.

15   A    The wheels and axles are designed to be conductive, so that

16   they will shunt out the current that we're intentionally sending

17   down the rails.

18   Q    So it takes the current from one rail and conducts it to the

19   other; is that right?

20   A    That's correct.  Yeah, in effect, like a short-circuit.  But

21   intentional.  It's a shunt.  And so the -- How do I say this?

22   The part of the circuit that's detecting that current at the

23   other end is unable to detect it because there's a train in the

24   block.  It understands that there's a train in the block and it

25   knows that block is occupied and, thus, will not allow a new

1  train in and communicates that information to our dispatch office

2  in Fort Worth that, ah, this block is occupied.

3  Q   In addition to the dispatch, it feeds that information to the

4  signals you described, the actual lights along the track; is that

5  right?

6  A   That's correct.  Yes.  They work simultaneously but

7  independently of one another.

8  Q   Okay.  So separate from what a train axle and wheels do, are

9  you familiar in your industry with something called a shunt?

10  A   Yes, I am.  Yes.

11  Q   What is a shunt?

12  A   Anything that will carry the current from one rail to the

13  other rail is a shunt.  We use shunts for testing the signal

14  system.  A piece of wire could be a shunt.  The train's axle is

15  also a shunt.

16  Q   Can the signal system tell the difference between a train

17  axle and a piece of wire?

18  A   No.  That's why we use them as a test.  It is a valid test of

19  our signal system.

20  Q   If you, in testing on behalf of BNSF, put a shunt on the

21  rails, where would you place it?

22  A   It depends on what I'm testing.  I could place it anywhere in

23  that block to --

24  Q   I'm sorry.  That was a poorly phrased question.

25       Where on the rail, meaning the top, the sides, the bottom,

1    where on the rail would be the place to put it?

2    A    It's kind of on the sides of the top of the rail.  I'm sure

3    everybody has seen a rail.  It's, you know, rounded at the top,

4    where the train runs, and we attach it to the sides of what we

5    call the ball of the rail.

6    Q    And why is that a good place to put the shunt?

7    A    There's a little less rust there because the train has been

8    running on it, cleaning that, and it's conveniently placed on the

9    top where we can -- Our test shunts are designed to penetrate the

10   rust layer, and working from the top, we're able to carefully

11   work it through any rust that is there.

12   Q    Why is rust an issue?

13   A    Rust is non-conductive, and so in order to detect the shunt,

14   which is our intention, we have to penetrate that layer of rust.

15   Q    And then that allows that current to travel through the

16   shunt?

17   A    That's correct.

18   Q    Okay.  So if rust presents this issue, would something like a

19   wire brush bit on a drill allow someone to increase the

20   conductivity of a wire with the rails?

21   A    Absolutely.  Anything that disrupts that layer of rust will

22   increase the conductivity.

23   Q    And as a rail, you mentioned the top part sort of gets

24   polished by trains going over.

25   A    Correct.

1    Q    In your experience, do other lower parts or the underneath

2    parts have rust on them?

3    A    Oh, yes.  Yes.  They're exposed to the weather.  There's

4    no regular action out there that clears the rust from, say, the

5    bottom of the rail or the foot of the rail.

6    Q    But if you brush that rust off, you would get a better

7    conduction?

8    A    Yes, you would.

9    Q    Okay.  I want to switch gears a little bit and talk about not

10   in your planned testing, but in unexpected situations, if a shunt

11   is unexpectedly put out there on the rails in the BNSF network,

12   what can happen?

13   A    Any number of things.  It can affect crossing circuits.  But

14   in the signalling -- since we're talking about the signalling

15   system first, it can cause a train -- it can cause a braking

16   event.  It could cause the train to stop because the engineer

17   believes that the block in which that wire is placed is occupied

18   by another train.  Remember, the signal system doesn't know the

19   difference between a wire and a train, so it sees that the signal

20   system detects an occupancy out there and acts to stop that train

21   short of a collision.  If it's very close to the train, they will

22   have to stop the train faster; they will have to go into

23   emergency stop.  It's a very dangerous act.

24   Q    So you can use the diagram you've helpfully drawn for us.

25   Suppose as that train, where you have it on the left, is moving

1  along and unexpectedly a shunt is placed in that very next

2  block --

3  A   In this one I will call "A."

4  Q   Yes.  Thank you.

5      -- in Block A, then would that trigger the sort of

6  circumstances you were just discussing?

7  A   Yes, it would.

8      If you can imagine this series of signals going on

9  indefinitely to the left, that train has already passed a signal

10 two miles back that indicated that the way ahead was clear --

11 they're still running at normal operating speed -- and then they

12 would suddenly get to the next signal and it would be red.  None

13 of this flashing yellow, yellow to red, giving them time to slow

14 the train.  They would immediately see a red and they would

15 immediately go into a braking event.  The engineer would use

16 their best judgment at that time as to whether they needed to do

17 an emergency braking event or to just brake it as fast as they

18 can, knowing that they're probably going to exceed that signal.

19 Q   Now, apart from engineer judgment, are you familiar with a

20 system called PTC?

21 A   Yes, very.

22 Q   What is PTC?

23 A   PTC is positive train control.  It's been enacted over the

24 last -- oh, we started working on it about a decade ago.

25 Positive train control is intended to stop a train in the event

1    of an engineer's incapacitation.

2    Q    Okay.  Give us an example of that.

3    A    A train engineer could have a heart attack, could have any

4    sort of health event that causes them to lose focus, to not

5    observe that signal or be unable to respond to that signal, and

6    if the PTC system decides that the train is too close to an

7    obstruction, it will simply stop the train, regardless of the

8    intervention of the engineer.  The engineer can be completely

9    incapacitated and the train will still stop.

10   Q    And even if the engineer is not incapacitated, PTC can just

11   override the engineer and initiate a stop; is that right?

12   A    Yes.

13        So in the case of the example you already gave, like a shunt

14   suddenly appearing in the block ahead, faster than the engineer

15   could react to that, PTC would have already picked up that shunt

16   and it would have already begun a braking event for that train.

17   Q    Because the system perceives suddenly the next block is

18   occupied?

19   A    Yes.

20   Q    Now, in that scenario, what's going to be the difference

21   between the stop that's initiated by PTC versus a stop initiated

22   by the train crew?

23   A    Right.  So an engineer has a feel for their train.  They

24   understand the makeup of the train.  They've got a conscience.

25   They know how long it is, they know how heavy it is, and they

1  know what it's going to take to brake that train in a controlled

2  manner.  PTC doesn't have it.  PTC, if it's enacted, it stops the

3  train.  So an engineer can bring this massive train to a careful

4  stop.  PTC just creates a stop.  And there's a lot of momentum

5  there, and I would say the momentum is unevenly distributed.

6  There are empty cars; there are full cars.  It takes more

7  distance to stop a full car than an empty car.  This can create

8  bunching in the train, where one train brakes slower or faster

9  than another train, and we compress the train.  And in extreme

10  cases, that has resulted in broken knuckles that connect the cars

11  to each other or even derailments.

12  Q    Okay.  So we're not just speaking in hypotheticals.  You are

13  familiar with situations where an unexpectedly placed shunt has

14  caused that sort of abrupt PTC braking and then separation of the

15  train?

16  A    Yes.

17  Q    Okay.

18  A    Yeah.

19  Q    Now, how about railroad crossings?  You started to mention

20  that briefly earlier, but I want to talk about that more.  So,

21  first, just so we're all on the same page with the terminology,

22  what's a railroad crossing?

23  A    Right.  So wherever the rails cross the paved motorway, we

24  calling it a crossing.

25  Q    Okay.  And, again, to get us sort of in the same frame of

1    mind, what are the components of the railway -- I'm sorry, the

2    railroad crossing?

3    A    Yeah.  So --

4    Q    And I could maybe clear this.

5    A    Oh, that would be great.

6    Q    So we can start with a fresh page.

7    A    There we go.

8         If you can picture the rails and a street crossing those

9    rails -- that is how we draw a street -- we have a low-voltage

10   alternating current, an audio frequency signal, that we transmit

11   down the rails and detect on the other side.  This is independent

12   of the current that we use for the block system.  And, in fact,

13   it can exceed a block if it has to.  We have that technology.

14        And so we send this signal down as far as we need it to go

15   and back to the other side, tapped onto the rail at four points

16   on either side of the street.  These points are 120 feet apart.

17   That's minimum.  We may have a larger, we call that an island.

18   Island minimum is 120 feet.

19        And so this voltage that we've set out, this current that

20   we're passing down the rails, allows us to detect a train coming

21   into the circuit and, in fact, can calculate its location, speed,

22   and direction such that we can preprogram this box to get a

23   specified warning time at that crossing.

24   Q    And is there a rule of thumb or guidelines for how much

25   warning you're trying to achieve at the crossing?

1    A    We do have minimums.  The federal government has set a

2    minimum of 20 seconds.  To that, BNSF has added an additional

3    10 seconds to compensate for variations and things like ballast

4    conditions, weather conditions, things that might cause minute

5    changes in the current that we're sending down the rails.

6    Q    When you say "seconds," how are you measuring that?  From

7    what event to what event?

8    A    From the time that the first light comes on at the crossing

9    to indicate to the motoring public that there's a train coming,

10   from the time the first light comes on to the time that the train

11   is at the roadway, at our wiretaps, which is where we can detect

12   it, we call that our warning time.

13   Q    Okay.  And as you were just saying, you're looking for some

14   number of seconds of that warning time?

15   A    Right.  So we have 20 seconds mandated by the government, 10

16   seconds that we add in for safety, and then there's an additional

17   four seconds that is simply the time it takes the computer to do

18   its calculation and recognize that there's a train in the circuit

19   and calculate its position, speed, direction, and come to the

20   correct warning time.

21   Q    Does that all add up to 34 seconds?

22   A    So that's 34 seconds.  So that's our minimum for most

23   crossings out there.  There are a variety of reasons why we might

24   want more warning time, but there are few reasons why you would

25   want less.

1    Q    Okay.  You mentioned lights, but what else is at the crossing

2    to alert others?

3    A    We also have gates that come down in front of the car and a

4    bell.

5    Q    Okay.  So those three things?

6    A    Yes.

7    Q    Now, this is sort of a crossing system generally that you

8    have drawn for us, but are you familiar with a crossing at

9    Cliffside Drive in the Bellingham area?

10   A    Yes, I am.

11   Q    And are you familiar with the shunt, the wire shunt, that was

12   found near Cliffside Drive on November 28th of 2020?

13   A    Yes, I am.

14   Q    So was that shunt placed near the Cliffside Drive crossing?

15   A    Yes, actually quite near it.

16   Q    Okay.  So understanding this system and how the crossing

17   activates and operates, how would that shunt placed there near

18   Cliffside Drive have affected that crossing system?

19   A    It would decrease the warning time given to the public.

20   Q    So maybe on your drawing show us that concept.  Why it would

21   decrease it?

22   A    So if you could imagine -- Let me just do this.  We will just

23   put the street down at one end so we don't have to draw it all

24   the way across, knowing that it continues on the other side, but

25   I just want to talk about one approach.

1     There's a train coming at it from this direction.  We're

2   sending a signal down here, down the rails, this alternating

3   current signal.  And we've already done this calculation.  In the

4   design office where I used to work, we did this.  And we would

5   say, okay, to get 34 seconds of warning time, knowing that the

6   train in this area is going to travel at this speed, we're going

7   to need X number of feet of approach length.  Yeah.  So we will

8   put a termination out there at the spot that we want the circuit

9   to look.

10  Q   And so just to be clear, that termination point is marking

11  the point you need to start measuring the train's approach; is

12  that correct?

13  A   That's correct, yeah.

14  Q   To achieve that desired --

15  A   Yeah, we don't need to look any farther.  That is correct.

16  Q   Okay.  That's the normal operation of the system.  But what

17  happens when that shunt is there?

18  A   If you could imagine this being 100 percent of our intended

19  distance or intended approach length, that also represents

20  100 percent of the warning time that we intended.  Whatever

21  percentage of the length that's essentially removed by having a

22  false shunt of wire across the track, it can only look to the

23  first thing that it sees.  Remember, I said before that the

24  system doesn't know the difference between a piece of wire and a

25  train wheel, so it's only going to look as far as the first thing

1  that shunts the track.  If that first thing takes out -- if it's,

2  say, 30 percent of the way here and it takes 70 percent out of

3  the circuit, well, then it also took 70 percent of the warning

4  time off.

5  Q   Okay.  So let's play that out.  The moment that shunt, in

6  your example, placed 70 percent along the way is actually

7  fastened to the rails, what's going to happen at that moment?

8  A   At that moment the crossing will activate.  It thinks there's

9  a train there.

10 Q   Okay.

11 A   It will activate.  It detects that there's no motion, though.

12 Remember, I said that the box can detect the train's position,

13 direction, and speed, and so it sees, ah, there's something here,

14 it activates immediately.  But it's not moving, so it recovers.

15 It lets the gates come back up, it turns the lights off.  There's

16 no reason for us to keep the motoring public waiting for a train

17 that is not moving.

18 Q   Okay.

19 A   And it will continue to look at that shunt, waiting for it to

20 move, thinking that it's a train, right?  It believes -- The

21 system behaves as if that shunt is a train and it's waiting for

22 that train to move.  So it's not looking for any other motion in

23 the circuit.  It's already detected where the train is.

24 Q   Okay.  So after the gates have gone back up, the system is

25 tricked into thinking no train is coming -- the gates are up,

1   lights are off --

2   A   Yeah.

3   Q   -- then suppose a train actually comes, play that out for us.

4   A   Then you would get, you know, very little or no warning time,

5   depending on where the shunt was placed.

6       Do you want me to talk specifically about the one at

7   Cliffside Drive?

8   Q   In a moment.  But just to make sure we're all following, so

9   is that new placement of a shunt effectively the border for the

10  warning to start?

11  A   It is, yes.

12      So in the drawing I drew, if this is the false shunt out

13  there, as this train is continuing, we're not detecting it, not

14  detecting, not detecting, all the way until we finally cross that

15  shunt.

16  Q   Okay.

17  A   We can only look to the first thing in the circuit.

18  Q   Okay.  So, yeah, let's now get a little more specific.  With

19  the shunt recovered on November 28, 2020, are you familiar,

20  ballpark, with where within the crossing system that shunt was

21  found?

22  A   Yes.  Yes.  We went and measured.

23  Q   Okay.  And so, roughly speaking, where was it?

24  A   It was -- I think it was 200 feet, if I remember right, yes.

25  Q   Yeah.  We don't have to be too precise --

1    A    Okay.

2    Q    -- but, okay, sure.

3    A    Yeah.

4    Q    I know your job is all about precision, but ...  Okay.

5    Roughly, 200 feet.

6        So do you also have an understanding at this particular

7    crossing at Cliffside Drive how that would have affected the

8    warning time?

9    A    The next train approaching that would have had between zero

10   and one second of warning time.  It's entirely likely that if a

11   train had approached the crossing with that shunt in place and a

12   car had been approaching it on the roadway, that the train would

13   have reached the roadway before the first light came on.  It's

14   very likely.

15            MR. KOPCZYNSKI:  I have no more questions.

16            THE COURT:  Mr. Sanders, how long do you anticipate on

17   cross-examination?

18            MR. SANDERS:  It's hard to say.  I would say at least

19   25 minutes maybe.  I'm sure it could be longer.

20        Our request would be --

21            THE COURT:  Yes, I would think so.  And then there might

22   be redirect as well, given the expert testimony.  So let's go

23   ahead and recess here, counsel.

24        So, ladies and gentlemen, we are going to recess for the

25   evening.  Mr. Shaffstall will be back in the morning and so will

1    you.  Hopefully.

2        So what's the process?  I want you back in our jury room over

3    there, in Judge Jones' courtroom, by about ten minutes to 9:00 or

4    so.

5        Anyone from Island County in this particular group?  We had

6    several jurors on our panel.  No.

7        Anyone from Sno County, Snohomish?  Okay.  Traffic is

8    terrible coming down here.  And I don't know how you get here,

9    but in the mornings --

10            UNIDENTIFIED JUROR:  I just live right across the

11   border.

12            THE COURT:  -- it's back up almost to prepandemic times,

13   unfortunately, on the freeways and stuff, so try to factor that

14   in.

15       Once you are all back there and stuff, our clerk,

16   Ms. Cuaresma, will check and see periodically a few minutes

17   before nine o'clock.  The hope is we can all get back into this

18   courtroom and start at nine o'clock in the morning, okay?  We

19   will go from 9:00 to noon, take a lunch break.  Remember, we're

20   buying you lunch, so there will be a sheet of paper with all the

21   different items that you can order, and go ahead and order on

22   there and we will have that ready for you for lunchtime.

23       So what happens tonight when you go home?  Whoever lives with

24   you is going to say, "What happened?"  They're going to be all

25   excited.  "What happened?"  I want you to tell them that you're

 1  on a jury, I want you to tell them the charges, what you are

 2  hearing, it's a criminal case, all right, violence against a

 3  railroad train, having to do with someone interfering with the

 4  signalling system, and then I want you to tell them, right after

 5  that, "And here is why I can't talk about it until after I'm

 6  done."  Because, being human, they are going to look right at you

 7  and start blurting out stuff about what they think or what they

 8  feel, and that is getting information that might influence you

 9  that's outside of the courtroom.  So go ahead and tell them that.

10  Tell them exactly what I told you.  "Look, this is very

11  controlled environment, and so your comments to me could

12  inadvertently impact my verdict and that's just not fair to the

13  parties."

14      So after we're done, you can take your notes home, you can

15  talk to your heart's content about everything that you heard or

16  anything that you learned here or anything else like that, but

17  until then, in all fairness to the parties, I need you to be

18  very, very careful about that, all right?

19      So, Madam Clerk, do they have your number?

20          THE CLERK:  They do not.  But I don't know where you

21  want them to put their notebooks.  They should put them over in

22  Judge Jones' courtroom and I will lock it up.

23          THE COURT:  Yes.

24          THE CLERK:  And I will give them my number.

25          THE COURT:  Okay.  So we will give you her phone number

1   if anything comes up in the morning, if you are stuck in traffic

2   and you know that you are not going to be able to make it.  If

3   something happens, please give her a call and let her know

4   because, otherwise -- you see everybody that is here -- we are

5   all waiting.  And until you are all here, we can't start, okay?

6       So other than that, everybody has got their little juror

7   badges and stuff.  Wear, you know, comfortable clothing.  You are

8   dressed fine, perfectly.  And we will see you tomorrow morning,

9   all right?

10      So you are free now to go back into Judge Jones' courtroom.

11  And I don't know if Madam Clerk has any other further little

12  instructions she wants to give you there.

13          THE CLERK:  No.  I will just hold the door on their way

14  out.

15          THE COURT:  All right.  Please rise for our jury.

16   (The following occurred outside the presence of the jury.)

17          THE COURT:  Counsel, I would love to have you all back

18  here about five minutes before 9:00 so we can try to start as

19  close to 9:00 as possible.

20      And from the government, if you could tell me, after this

21  particular witness, what order do you plan to call them in?

22          MR. KOPCZYNSKI:  Yes, Your Honor.  So after

23  Mr. Shaffstall, we expect Deputy Chambers, Deputy Streubel, and

24  then subject to some discussions later today, we may rest at that

25  point.

1          THE COURT:  Okay.  Perfect.

2      Anything further from the defense before we rest today?

3          MR. CANTOR:  Well, I did have a chance to look at the

4  commentary, if the Court wanted to address that today, to that

5  Model Instruction 215.  We can address it tomorrow.

6          THE COURT:  No, we will do that tomorrow.  That's fine.

7          MR. CANTOR:  That's fine.

8          THE COURT:  All right.  Have a great evening.

9          MR. CANTOR:  I'm sorry.  My client does have a question,

10  and that has to do with, she wants to know, is this trial being

11  streamed to another courtroom?

12          THE COURT:  It is not.

13          THE CLERK:  It is not.

14          THE COURT:  Nope.  Just here.

15          MR. CANTOR:  Got it.

16          THE COURT:  All right.

17          MR. CANTOR:  Thank you.

18          THE COURT:  Madam Clerk, we will be at recess.

19                      (Adjourned.)

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4  United States District Court in the Western District of

5  Washington at Seattle, do certify that the foregoing is a correct

6  transcript, to the best of my ability, from the record of

7  proceedings in the above-entitled matter.

8

9                    /s/ Nickoline Drury

10                   Nickoline Drury

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25