CHIEF JUDGE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 20-215-RSM |
| Plaintiff, | ) | |
| v. | ) | DEFENDANT'S SENTENCING MEMORANDUM |
| ELLEN BRENNAN REICHE, | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

Ellen Reiche, through counsel, presents this sentencing memorandum in support of the defense's recommendation for a sentence that does not exceed six months—specifically, a sentence similar to what was imposed for co-defendant Samantha Brooks.

On November 28, 2020, both Ellen Reiche and Samantha Brooks were arrested on the railroad tracks near Marine View Park, north of Bellingham, in Whatcom County Washington.  Both were present on the tracks with the intent to place a piece of copper wire hidden under the track's ballast that connected to the tracks.  This connection served as a "shunt" by generating an electrical current that interfered with the signal system.  The result was a false indication that the block of tracks where the shunt was placed was occupied with a train.  There is no dispute that the defendants never intended to cause harm to anyone or cause physical damage to the trains or BNSF

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

property. Rather, the intent was to delay and stop trains that carried fossil fuels. Until the hidden copper wire was found, the signal systems would continue to indicate that the block of tracks was occupied thereby causing approaching trains to stop and wait until the block was cleared.

After Samantha Brooks and Ellen Reiche were arrested, the two were charged in Federal Court with the exact same crime—one count of violating 18 USC 1992(a)(5). For all intents and purposes, their offense conduct was one and the same. The only material difference between the two cases was that Samantha Brooks pled guilty while Ellen Reiche elected to exercise her Constitutional right to be tried by a jury of twelve. Yet with respect to the offense conduct, the two had the same level of culpability. For these reasons, and as elaborated further in this memorandum, This Court should impose a sentence of no more than six months in custody.

## II.   PERTINENT FACTS

The facts presented at trial proved that both Ellen Reiche and Samantha Brooks executed a plan to install a copper wire shunt underneath the railroad tracks late at night on November 28, 2020. Both arrived at the scene together. Both attempted to run away when the police arrived. When the arriving officer told them to stop, they both stopped and waited for the officer to make contact.

On October 8, 2021, This Court sentenced Samantha Brooks who addressed the court. Samantha Brooks never claimed to be an inactive bystander not knowing the plan. In fact, Samantha Brooks acknowledged their plan and that there was never any intent "to go into this with larger political intentions, or even intentions to derail a train." Ex. 1, p. 16. Instead, the intentions of both defendants was to stop and delay trains carrying fossil fuels.

At the time of the offense, neither Ellen Reiche nor Samantha Brooks were aware that "shunting" the block of tracks could lead to a derailment or possibly lead to

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 2

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

a crossing arm malfunction. Samantha Brooks made this point clear at sentencing on October 8, 2021, and it appears that This Court accepted the claims that there was never any intention to derail trains because neither knew that shunting could potentially cause that type of harm. Similarly, Ellen Reiche, in her letter to the court, emphasized that there was never any intent to cause harm or damage—being consistent with her co-defendant's position and statements to This Court.

The first time that Ms. Reiche learned about shunting was through the blogs posted on websites advocating for action to stop or delay the movement of fossil fuel trains—particularly those trains that travel through indigenous lands. The method promoted was to use copper wire to "interrupt the track circuit used to detect the presence or absence of a train on the tracks." Exs. 2 & 3. The suggestion from these blogs was that this particular method for confusing the signal systems was peaceful and non-violent because the result would be "to generate enough confusion in the system to cause big slow downs and bureaucratic delays." *Id.* Nowhere was there any suggestion or hint that shunting would somehow cause a derailment.

There was one blog, however, produced in the government's discovery that discussed more destructive methods available to stop the trains. Ex. 4. This particular blog listed methods that included physically destroying the signal boxes, physically destroying tracks, and arson. The blog also noted the copper wire method. Specifically, the blog made clear that "the copper wire method" was the least serious—presumably because the copper wire method would not lead to any damage or destruction. In fact, the blog warned that using destructive methods, such as arson, will cause law enforcement "to investigate more seriously" than if choosing to use the non-violent "copper wire method."

Of course, Ellen Reiche and Samantha Brooks chose to use the "cooper wire method" instead of the destructive methods. In 2020, there were 42 documented

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 3

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

shunting incidents that used the "copper wire method" as we learned during trial. None led to any derailments. There was one incident in October of 2020, as we learned at trial, that caused a train to deploy its emergency breaks resulting in damage to one of the car's drawbars. Fortunately, all cars remained on the tracks, there was no environmental damage, and no one got hurt.

From a statistical perspective, there was never any notice to the defendant that the copper wire method would (or even could) present a harmful threat to people, or to the environment, or even to the trains. If out of 42 incidents, the worst outcome was one damaged drawbar that never publicly made news, it then makes sense that neither Ellen Reiche nor Samantha Brooks ever envisioned a possible doomsday scenario that their conduct might cause. At trial we learned from a BNSF expert that shunting could possibly lead to a disaster because shunting could cause a train to deploy its emergency breaks while at a fast speed. And depending on the terrain and topography of the area, that could lead to a derailment. The fact remains that any type of trespassing on to the tracks can similarly lead to this scenario, particularly if the trespassers are physically obstructing the tracks by being on the tracks. Might that also cause an oncoming train to deploy its emergency breaking in order to avoid a fatality?

Overall, the evidence before this court supports Ms. Reiche's assertions presented in her letter that the objective was to stop and delay the trains. Never was there any thought about harming the trains because Ms. Reiche was unaware of any possible harms that might arise from the "copper wire" method. After all, the blogs seem to support the claim that the "copper wire" method will simply cause delays without causing damage, unlike some of the other listed methods (such as destroying the signal box, damaging the train tracks, or committing arson). Ms. Reiche and Samantha Brooks chose the method that did not advocate for any destruction of

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

property—which is consistent with the statistics that out of 42 incidents in 2020, there were no derailments resulting from copper wire shunting.

### III. THE UNITED STATES SENTENCING GUIDELINES

United States Probation calculates the defendant's total offense level at 18. Probation argues that the base offense level should be 18 because the offense involved "recklessly endangering" the safety of the trains that run along the BNSF tracks where the shunt was placed. Furthermore, Probation argues that the defendant should not receive any reduction for acceptance of responsibility, notwithstanding her letter of acceptance of responsibility, because the commentary advises against this reduction where the defendant elects to go to trial. The defense respectfully disagrees.

> A. *The upward adjustment for "recklessly endangering" the safety of a mass transportation vehicle, such as freight train, requires proof by clear and convincing evidence.*

The defense agrees that USSG §2A5.2 applies to this case where Ms. Reiche was convicted of interfering with the railroad signal systems pursuant to 18 U.S.C § 1992(a)(5). However, there are no known published opinions interpreting this guideline specific to the crime of interfering with railroad signal systems. That said, there are published opinions interpreting this guideline as it would apply to similar crimes such as "interfering with flight crew" and "recklessly endangering an aircraft" by aiming a laser beam toward the cockpit. Although both crimes are punished under different chapters of the United States code, their commonality with the instant case is that the overall offense conduct for all three crimes is subject to the same sentencing guidelines under Section 2A5.2. This is because all three crimes affect a mass transportation vehicle (either an aircraft or a train).

In *United States v. Gonzalez,* 492 F.3d 1031 (9th Cir. 2007), the defendant was convicted of interference with a flight crew member. The parties agreed that USSG §2A5.2 was the appropriate guideline. That guideline starts with a base offense level of

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 5

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

9. However, if the evidence supports that the offense conduct "recklessly endangered the safety of . . . the mass transportation vehicle," then the base offense level doubles to 18. Because of the disproportionate impact on the ultimate sentence imposed due to the large gap between these two base offense levels, the Ninth Circuit held that the appropriate standard of proof was the "clear and convincing evidence" standard. *Id.*, at 1036.

Subsequent to *Gonzalez*, the Ninth Circuit reiterated this "clear and convincing" standard of proof in the context of applying USSG § 2A5.2 to the crime of knowingly aiming a laser beam at an aircraft. *United States v. Gardenhire*, 784 F.3d 1277, 1280 (9th Cir. 2015). Accordingly, This Court must find, by clear and convincing evidence, that the defendant's offense conduct recklessly endangered the safety of the trains before subjecting the defendant to a base offense level of 18.[1]

> B. *Insufficient evidence, per the clear and convincing standard, to prove the offense involved recklessly endangering the safety of a mass transportation facility or a mass transportation vehicle.*

*Gardenhire* provides guidance in determining whether the offense conduct rises to the level of reckless endangerment under USSG §2A5.2. In *Gardenhire*, the defendant purposefully aimed a laser beam at an incoming seven passenger airplane as it was approaching the airport for landing. *Gardenhire*, at 1278. The laser struck the pilot's eye temporarily blinding and distracting the pilot. *Id.* The pilot was safely able to land and neither the plane nor the people on board were hurt. *Id.* The defendant then aimed the laser at a police helicopter that was dispatched to the area. *Id.*

Upon arrest, the defendant admitted that he was responsible for pointing the laser beams at the aircrafts. *Id.*, at 1279. The defendant also admitted that his friend warned

---

[1] The fact that this court applied a base offense level of 18 to the co-defendant is not controlling. That is because the co-defendant did not litigate this issue. Instead, the co-defendant stipulated to a base offense level of 18 without this court considering the appropriate standard of proof and without this court assessing whether there was sufficient evidence to support the element of recklessness.

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 6

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

him against shining the laser directly at anyone's eye because it could blind someone. *Id.* Finally, the defendant stated that at the time he intentionally aimed the lasers at the pilots, he did not think about the dangers of pointing the laser at the aircraft. *Id.*

The defendant pled guilty to one count of aiming a laser beam at an aircraft in violation of 18 U.S.C. § 39A (after the government agreed to dismiss the incident involving the helicopter as part of the plea agreement). *Id.*, at 1279. The only dispute at sentencing was whether the defendant "recklessly endangered" the safety of an aircraft within the meaning of USSG § 2A5.2(a)(2). *Id.* U.S. Probation argued that the correct base offense level was 18 because the defendant "knowingly and intentionally aimed a laser pointer at both the airplane and the helicopter." *Id.* The District Court agreed and imposed a sentence that reflected the base offense level of 18 in accordance with USSG § 2A5.2(a)(2). The sentencing judge imposed 30 months emphasizing the "need for deterrence" and "expressed the hope that the sentence would be publicized so that 'young people' would know this sort of prank cannot be tolerated." *Id.*, at 1280.

The defendant appealed the sentence arguing that he did not recklessly endanger the aircraft. Because the appeal raised a substantial question of law or fact that was fairly debatable, the court granted the defendant an appeal bond. *Id.*, at 1280, n.3.

In reviewing the question of whether the defendant recklessly endangered the safety of the aircraft, the appellate court first had to decide what it means to be "reckless." *Id.* at 1280. The Ninth Circuit adopted the "reckless" definition used by the district court and as defined under USSG § 2A1.4 in the context of involuntary manslaughter. Specifically, Section 2A1.4 defines "reckless" as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *Id.*

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

In the end, the Ninth Circuit vacated the sentence because the district court erred in concluding that the defendant acted recklessly when he aimed the laser at the aircraft. Notwithstanding the evidence that the defendant's friend warned him of the dangers, the Ninth Circuit ruled: "The record is devoid of evidence, let alone clear and convincing evidence, that Gardenhire was aware of the risk created by his conduct." In arriving at this decision, the court pointed out that the government (and Probation) failed to present any evidence "of what even an average person would know about the effects of aiming a laser beam at an aircraft." Accordingly, the evidence failed to prove the reckless endangerment prong of USSG § 2A5.2(a)(2) by the clear and convincing evidence standard of proof.

In the instant case, similar to *Gardenhire*, the government presented no evidence at trial that supported a subjective awareness of the risks of danger created by connecting a copper wire "shunt" to the railroad tracks. Certainly there was sufficient evidence to prove that this method would stop and delay the trains. That said, this evidence does not prove that the defendant was aware of the risk to the safety of the trains created by connecting the copper wire to the tracks. *See Gardenhire* at 1283: "[H]ere, the government introduced no evidence that supported a subjective awareness of the consequences of aiming a laser beam at an aircraft, and the bare admission that Gardenhire intentionally aimed the laser, knowing that it was dangerous to shine the laser in someone's eyes, does not support the inference the district court drew—that he was aware of the dangers to the aircraft from doing so."

The evidence presented at Ms. Reiche's trial proved that the wire shunts delay trains because the block of tracks will remain "occupied" until the hidden shunt is found. On very rare occasions, the wire shunts can cause a train to deploy its emergency breaks. For example, in the year 2020, out of 42 shunting incidents only one train had to deploy its emergency breaks. There were no incidents of a derailment.

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Additionally, although there was testimony that wire shunts could interfere with the crossing gates, there were no reported incidents (out of the 42 shunts discovered) that the crossing gates were ever impacted by the shunts.  Finally, the blogs about using the copper-wire shunting method make no mention that this potentially could cause damage to trains or present a risk to people.  As such, there was no evidence that the dangers associated with copper wire shunting were of general knowledge to the average person or of specific knowledge to the eco-activist population.  Accordingly, the government presented no evidence to support the argument that Ms. Reiche was subjectively (or objectively) aware of the consequences of connecting the copper wire to the tracks— *other than being aware that this conduct would simply delay train traffic in the area.*

For these reasons This Court should find, consistent with *Gardenhire*, that the correct base offense level is 9 pursuant to USSG § 2A5.2(a)(4).

> C. *Ms. Reiche is entitled to an Acceptance of Responsibility reduction notwithstanding her decision to exercise her constitutional right to a trial by jury.*

Ms. Reiche, in advance of sentence, presented a letter to the court and to U.S. Probation expressing acceptance of responsibility for her conduct.  After reviewing the letter, Probation appreciated the letter and found it to be very insightful.  However, based on the commentary of USSG § 3E1.1, advising against any reduction for those who elect to go to trial, Probation declined to grant a two-level reduction for acceptance of responsibility.  *See commentary note 2.*

The defense asserts that that the plain text of Section 3E1.1 is clear and unequivocal.  Specifically, "[i]f the defendant clearly demonstrates acceptance of responsibility for [her] offense, decrease the offense level by 2 levels."  This language means that clear acceptance of responsibility prior to sentencing supports the 2-level reduction.  Even the commentary acknowledges the sentencing court's authority to give a 2-level reduction despite the defendant's decision to go to trial: "In rare situations a

DEFENDANT'S SENTENCING
MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

defendant may clearly demonstrate acceptance of responsibility for [her] criminal conduct even though [she] exercised [her] constitutional right to a trial." *Application n. 2.* True, the United States Sentencing Guidelines are advisory. But to conclude that Ms. Reiche is not entitled to a reduction under Section 3E1.1 because she chose to exercise her constitutional right to a trial would be error.

In *Kisor v. Wilke*, 139 S. Ct. 2400, 2414-15 (2019), the Supreme Court explained that agencies get deference in interpreting their own regulations when the regulation is "genuinely ambiguous." In other words, a regulation is not "genuinely ambiguous" unless it is still ambiguous after the court "exhaust[s] all the traditional tools of construction." *Id.*, at 2414.

The United States Sentencing Commission is to be treated as an "agency." In *Stinson v. United States*, 508 U.S. 36, 44 (1993), the Supreme Court explained that the guideline commentary was basically an agency's interpretation of its own regulation. Therefore, the commentary gets deference <u>*only if*</u> a guideline is genuinely ambiguous after the court exhausts the traditional tools of construction. One tool of construction that stands out is "the rule of lenity" where the court would look at the plain text of guideline. *See United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021)(en banc) ("As we rework the Sentencing Guideline cases, lenity is the tool for the job.").

Ellen Reiche clearly accepted responsibility prior to sentencing. Although Ms. Reiche chose to go to trial, the plain language of Section 3E1.1 allows for the two-level reduction so long as "the defendant clearly demonstrates acceptance of responsibility for [her] offense." Accordingly, This Court should reduce Ms. Reiche's offense level by two levels and then find that the total offense is seven.

//
//

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 10

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

D. *The Defendant's Sentencing Guideline Range is 0 to 6 months.*

Ms. Reiche has a criminal history category of I. As argued above, the correct base offense level for this offense is 9. Ms. Reiche has also clearly demonstrated acceptance of responsibility prior to the imposition of her sentence. Therefore, her total offense level should be 7 leading to an advisory guideline range of 0 to 6 months.

IV.   **THE SECTION 3553(a) FACTORS**

A. *The Nature and Circumstances of the Offense*

The evidence presented at trial demonstrated that the defendant's objective was to stop and delay trains carrying fossil fuels. The jury found Ms. Reiche guilty of interfering with the railroad signal system by connecting copper-wire to the tracks. No evidence was presented that Ms. Reiche caused any damage to the tracks or to the signal system itself. Although there was testimony that interfering with the signal system could possibly impact the crossing gates, there was no evidence that the Marine View Park crossing arms were impacted.

A BNSF employee testified that the wire shunt worked because the block of tracks for that area showed it being occupied. The occupied block would then communicate with the signals on adjoining and nearby blocks telling trains to either slow down or to stop until the block at Marine View Park was cleared. This conduct, of course, meant that Ms. Reich was beyond the crime of trespassing. At the time, being November 28, 2020, Ms. Reiche understood through her research that "shunting" was a safe and peaceful form of protest. Defendant's letter, p. 3. In the end, by the conclusion of her trial, Ms. Reiche fully understood the potential dangers that could arise from shunting:

> It became clear to me that my actions were much more dangerous than I ever thought. I was mortified to learn that a train could have derailed and caused any kind of environmental damage, whether through spilling its cargo or

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 11

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

> through something like a locomotive explosion. I was also mortified to learn that the crossing gates could have been impaired and put the public at risk of injury or death. I'll say again with utmost sincerity that I never would have engaged in shunting if I had known about any of these risks. As the trial continued, I regretted my actions more and more. Now that it's all said and done and I fully understand the dangers of shunting, I can say with honesty that I wish I had never done it.

*Reiche letter,* p. 4

These words show that Ms. Reiche fully appreciates the seriousness of her offense. She fully understands that this conduct is not an acceptable form of protest and that it can never repeat itself again. Knowing how much Ms. Reiche is involved with youth education, particularly on environmental issues, we can all be certain that Ms. Reiche will use this experience to teach others about safe, lawful, and more effective methods of environmental advocacy and protesting.

This Court determined that six months of custody was appropriate for the co-defendant who engaged in the same exact offense conduct. If six months of jail is sufficient punishment for Samantha Brooks, who also connected the wire to the tracks, then the same outcome would be fair for Ms. Reiche based on the nature and circumstances of this offense.

B. *The Personal History and Characteristics of the Defendant.*

Ms. Reiche is well loved by so many people in her community. The overwhelming volume of support letters submitted on behalf of Ms. Reiche demonstrate that she is a well-respected young woman who is admired by so many people. People admire Ms. Reiche because of her community service and her dedicated work helping others—particularly children.

Ms. Reiche has dedicated her time to help youth by educating them about environmental issues. She also has a special place in her heart for disabled children and children with special needs whom she helps. For example, when the parents of two

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 12

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

children with Down Syndrome asked Ellen if she would be willing to give monthly skiing lessons to the children she did not hesitate to accept the request.  When she was asked by a local school in Whatcom County to take students with disabilities and special education needs on a field trip to do "nature walks," Ellen did not hesitate to accept the request.  Ms. Reiche accepted these requests because she is genuinely passionate about helping others, particularly those in need who are facing challenges themselves.

The volume of support letters show us that Ms. Reiche is a generous, kind, and compassionate person who wants to help people because she cares about people and the environment.  As the Probation report states, this one-time incident that has landed Ms. Reiche in a criminal court with a federal felony conviction does not define who she is as a human being.  She undoubtedly will get back on her feet at the conclusion of her sentence and hopefully other schools and other educational programs will trust Ms. Reiche to work with kids and students even though she now has this blemish on her record.

C. *The Need for Deterrence*

There is no question that Ms. Reiche has been deterred from ever thinking about doing something like this again.  Probation, in the pre-sentence report and sentencing recommendation, suggested that this incident very well may have deterred others since there have been no reported shunting incidents since the November 28, 2020 arrest.  Apparently, since November 28, 2020, there have been no reported shunting incidents that we know about.  If that is true, then the simple fact that Ms. Reiche and Samantha Brooks were indicted on federal charges should be a sufficient-enough deterrent to the general public.  In other words, the court's imposition of 6 months of jail for co-defendant Brooks was really not the deterrent.  Instead, the true deterrent would have been the filing of federal felony charges in the first place—if indeed it is true that this case has prompted others to re-consider shunting as a method of protest.

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 13

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

D. *The Need to Avoid Disparate Sentences*

The offense conduct of both Samantha Brooks and Ellen Reiche was the same. They both planned to connect copper wire to the railroad tracks in order to disrupt the signal communications leading to a stoppage of freight train traffic. The copper-wire method was particularly appealing because it would serve its purpose of stopping trains in the area until the wire was discovered. Moreover, the copper-wire method was considered a peaceful and non-violent method to achieve the goal of stopping the trains carrying fossil fuels. For that offense conduct This Court sentenced Samantha Brooks to 6 months in custody.

Probation's 14-month recommendation seems to suggest that the only reason why Ellen Reiche deserves a 14 month sentence, instead of 6 months, is because she decided to go to trial:

> Ellen Reiche and Samantha (Sam) Brooks **_acted together_** when placing the shunt on the railroad track. However, Ms. Brooks also pled guilty in a timely manner and accepted responsibility for their role. They did not put the government to burden by going to trial. Sam brooks also benefitted from a minor role reduction as it appears they acted [at] Ms. Reiche's direction. [Emphasis added].

*Probation's recommendation, p. 2.*

This Court presided over trial with the benefit of listening to and observing all of the government's evidence. There was never any evidence presented to This Court to support the claim that Sam Brooks acted at Ms. Reiche's direction. To the contrary, the evidence showed that the two "acted together" when connecting the shunt to the railroad tracks, as noted in Probation's sentencing recommendation.

For over 50 years, United States Supreme Court precedent dictates that trial penalties are unconstitutional. Specifically, "[t]o punish a person because [s]he has done

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 14

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

what the law plainly allows [her] to do is a due process violation of the most basic sort." *North Carolina v. Pearce*, 395 U.S. 711, 738 (1969).

The only difference between Ellen Reiche and Samantha Brooks was that Brooks elected to plead guilty and forego a jury trial. Ellen Reiche, on the other hand, elected to exercise her constitutional right to be tried by a jury of her peers. Setting that distinction aside, had Ms. Reiche elected to plead guilty when Brooks pled guilty, it would be hard to imagine a scenario with the two receiving different sentences particularly since the evidence shows that the two acted together when placing the shunt on the railroad tracks.

This Court was never presented with any evidence that Ms. Reiche was somehow the leader and Sam Brooks was somehow the follower. For that reason, there is no factual support for punishing Ms. Reiche as if she carried more culpability than her co-defendant. Our record is clear. The two shared equal culpability as they acted together. The only distinction, of course, is that Ms. Reiche chose to go to trial which is her right.

E.  *Alternatives to Confinement*

Should this court feel the need to impose a longer sentence for the defendant, we respectfully ask the court to consider converting that additional time to an alternative form of confinement. Hopefully This Court appreciates the community service time that Ms. Reiche has volunteered for throughout her young adult life. She would be more than willing to engage in additional community service hours as an alternative to incarceration (similar to how State Courts convert 30 days of jail into 240 hours of community service). House arrest is another viable alternative form of confinement that is less punitive than prison, but punitive nevertheless. Ms. Reiche is a very busy woman currently working three jobs. During the summer, she also devotes her time working with kids who are in Summer camp. In short, you will never find Ms. Reiche being without something productive to do with her time. A sentence that incorporates

DEFENDANT'S SENTENCING MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 15

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

alternative confinement will certainly help Ms. Reiche continue to serve others and it would achieve the Section 3553(a) goal of avoiding disparate sentences.

## V.   CONCLUSION

Ellen Reiche is not a threat to the community.  She presents a very low risk of re-offending.  She committed a non-violent offense all while having no prior criminal convictions.  Ellen Reiche is a positive member of her community who serves others, including youth who are disabled or who have special needs.  None of these claims are in dispute.  There is that timeless canon of law, "*let the punishment fit the crime*."  If 6 months was sufficient for Sam Brooks, then 6 months should be sufficient, and not greater than necessary, for Ellen Reiche.

DATED this 8th day of December, 2021.

Respectfully submitted,

s/ *Jesse Cantor*
Assistant Federal Public Defender
Attorney for Ellen Reiche

DEFENDANT'S SENTENCING
MEMORANDUM
(*USA v. Reiche* / CR20-215-RSM) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**