Chief District Judge Ricardo S. Martinez

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br><br>          v.<br><br>ELLEN REICHE,<br><br>                         Defendant. | Case No.  CR20-215 RSM<br><br>GOVERNMENT'S SENTENCING MEMORANDUM FOR ELLEN REICHE<br><br>Sentencing: December 17, 2021 |

Defendant Ellen Reiche and her co-defendant placed a wire shunt on BNSF Railway train tracks in Bellingham. Sheriff's deputies apprehended them, and a federal grand jury indicted them for committing an act of violence against the railway. The co-defendant proffered with the government and pleaded guilty, while Reiche elected to go to trial. The jury found her guilty. The evidence at trial established that Reiche drove to the site where they placed the shunt, and Reiche carried the wire and other necessary equipment. The evidence also established the dangers posed by their actions—including that shunts can delay trains and dramatically shorten the warning times at railroad crossings. Shunts can even cause trains to decouple or derail. These risks were especially acute here because BNSF Railway trains frequently carry crude oil and other hazardous materials. For her part in this

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

serious crime, the Court should sentence Reiche to 27 months in prison, which is at the low end of the Guidelines range, and three years of supervised release.

# I. The Offense

### A. Criminal Conduct, Charge, and Trial

On November 28, 2020, near midnight, Reiche and co-defendant Sam Brooks ventured out onto BNSF train tracks near several homes and a public park in Bellingham, Washington. PSR ¶¶ 7–11. Law enforcement officers were closely watching the tracks in this area because there had been a string of dozens of shunting incidents in this and surrounding areas in the preceding months. PSR ¶¶ 6–8. That night in November, a camera placed by the BNSF police spotted the defendants, and sheriff's deputies quickly responded to the scene. PSR ¶¶ 8–9. A deputy found Reiche and Brooks bent over the tracks, and he soon found a shunt that they had placed on the tracks in that spot. *Id*. Reiche was carrying a bag that contained wire, a drill with a brush bit, and other items that would be used to place a shunt. *Id*.

Shunts trick the railroad signal system by making it appear that a train is on the tracks. PSR ¶ 8. Any actual trains approaching the area will be forced to slow down, and if already close enough to the shunt, the train engineer (or backup safety systems) will stop the train suddenly to avoid the perceived threat of a collision. *Id*. Freight trains are massive and not designed to stop suddenly, and they can decouple or even derail from the abrupt braking. *Id*. Indeed, a shunt placed on BNSF tracks in October 2020 caused a train to engage emergency braking with such suddenness and force that it decoupled and could have derailed. Tr. 45:4–16.[1] BNSF trains often carry hazardous freight, making such scenarios all the more dangerous. A BNSF witness testified that the trains may carry "chemicals, crude oil, [and] coal." Tr. 43:4.

---

[1] Citations to "Tr." are to the transcript from Reiche's September 2021 trial.

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The shunt placed by the defendants in this case was operational only momentarily, PSR ¶ 10, perhaps because they were interrupted by deputies before firmly affixing the wire to the rails. This is fortunate, because the next train scheduled to pass through was carrying 97 cars of crude oil. PSR ¶ 11. In addition, this shunt was placed at a location where it would have interfered with a nearby railroad crossing at Cliffside Drive. PSR ¶ 10. The lead time for the lights, bells, and gates at that crossing would have been severely shortened and perhaps nonexistent, meaning drivers could have driven into the crossing unaware of an approaching train. *Id.*; Tr. 105:16–109:14.

Reiche and Brooks were indicted for committing an act of violence against a railroad carrier, in violation of 18 U.S.C. §§ 1992(a)(5), (a)(10), and (c)(1). Dkt. 15. Brooks admitted their role in the offense and pleaded guilty. Dkt. 34. The Court sentenced Brooks to six months of imprisonment and three years of supervised release, with Brooks ordered to complete four months of home confinement and 200 hours of community service while on supervision. Dkt. 81. Reiche, by contrast, persisted in her not guilty plea, and after a three-day trial, she was convicted. Dkt. 71. Reiche now appears before the Court for sentencing.

### B. Sentencing Guidelines

The Probation Office correctly states in the Presentence Investigation Report that the offense level is 18 under Chapter 2A5.2 of the Sentencing Guidelines because Reiche's offense involved "recklessly endangering the safety of . . . a mass transportation vehicle." USSG § 2A5.2(a)(2); PSR ¶ 18. The evidence at trial showed that she deliberately trespassed on BNSF property and sabotaged the signaling system for trains carrying hazardous materials. When deputies arrived, she tried to flee; once caught, she lied about her reasons for being there. The Court can infer from the entire course of her conduct that she understood she was putting the trains in danger and ignored that risk. Any reasonable person would perceive that there is danger in disabling the systems that help control massive freight trains.

In addition, as Probation says, Reiche should not receive a reduction of the offense level for acceptance of responsibility. PSR ¶ 25. She vigorously contested her factual guilt before and throughout the trial, and she only claimed to accept responsibility after the jury

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

convicted her. Her post-trial statement, while insightful and encouraging in many ways, does not entitle her to a reduction of the offense level.

Reiche disputes Probation's calculation by claiming that she did not act recklessly and that she has shown sufficient contrition, even if post-trial, to deserve the two-level reduction of the offense level. Her arguments are unavailing.

### 1.     Recklessness

Reiche first argues that her base offense level should be 9, not 18, because there is no evidence that she acted recklessly. In a lengthy statement to the Court written after her conviction at trial and attached to the Presentence Investigation Report, she claims that she began down the path toward her offense when she became interested in "direct actions" and discovered shunting through internet research. She claims that she studied "[m]ultiple reports and articles" about shunting but never saw any indication of "any kind of danger associated with the act." Thus, she claims, she understood that shunting was an "entirely safe" way to take a stand against climate change, and she had no idea that "any harm to humans or the environment could come" from it. She claims she only realized the extreme risks involved when confronted with the government's evidence at trial.

Reiche's statement, while both enlightening and heartening in many other respects, defies belief on this point about her state of mind. The trial record shows she understood that her conduct posed risks to the trains. Although of course she may not have grasped the "intricacies of crossing signals" or other technical details, as she now says, the relevant question here is far simpler—it is whether she knew that she was in some way "endangering the safety of" trains by placing a shunt on the rails. USSG § 2A5.2(a)(2). The Court's answer to that question must be yes.

The evidence at trial showed that Reiche both knew what she was doing and knew it was illegal and dangerous. She went to the tracks near midnight wearing "[b]lack, head to toe. Mask, shirt, jacket, pants. Everything was black." Tr. 160:20–21. To get to the spot where she and Brooks placed the shunt, she had to pass a sign warning that it was private property. Tr. 55:11–12. When a deputy caught her in the act, she first tried to get away, then

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1. told elaborate lies about her reasons for being there. Tr. 159:20–163:15. She and Brooks had
2. buried the shunt, apparently to make it harder to find. Tr. 166:16. They also had left their
3. cellphones at home, apparently to make themselves harder to find. Tr. 59:5, 162:20. All these
4. actions reflect an understanding about the riskiness of their conduct. This was a far cry from
5. peaceful protest.

      In addition, Reiche now claims that none of the information that she reviewed on the internet about shunting before committing this offense gave her any clue that it could be dangerous. But that implausible claim is belied by available evidence. One prominent internet posting on this topic from February 2020 involved an anonymous group claiming responsibility for several shunting incidents in Western Washington.[2] The post described that a shunt "creates a dead zone along the tracks and prevents operators from knowing whether or not a train is present." *Id*. A person reading that statement would not believe that it is, in Reiche's words, "entirely safe" for freight train operators to have no idea whether a train is present on the rails. This and similar postings did not describe what could go wrong, but any reasonable person would appreciate that creating "a dead zone" along an active railway in a residential neighborhood poses risks, no matter the exact nature or magnitude of those risks. This is all the more true because Reiche knew that BNSF trains carried crude oil—a highly hazardous substance. Indeed, she says she wanted to sabotage the railway precisely because of the hazardous cargo the trains carried.

      The February 2020 internet post is notable for another reason. In it, the writer describes modifying "the basic jumper-cable technique" for creating a shunt. That statement is hyperlinked to a video, apparently created in or around 2016, that describes in basic terms how shunts work and suggests using jumper cables for the connection. But Reiche, like this poster, modified that method by using wire. She also brought along a drill with a brush bit to

---

[2] *See* https://pugetsoundanarchists.org/whatcom-county-railway-sabotaged-in-solidarity-with-wetsuweten-again (attached to this filing as exhibit A). The Court can judicially notice publicly available internet postings such as this one. *See* Fed. R. Evid. 201.

GOV'T SENT. MEMO  
*United States v. Reiche*, CR20-215 RSM - 5

UNITED STATES ATTORNEY  
700 STEWART STREET, SUITE 5220  
SEATTLE, WASHINGTON 98101  
(206) 553-7970

remove rust from the rails and improve conductivity for the shunt. That idea is not discussed anywhere in these internet sources, and Reiche does not say where she learned of it. The Court can infer that Reiche studied shunting in great detail, and perhaps conferred with those responsible for earlier incidents, if she was not more involved. This all runs contrary to her claim now that she had no idea what she was doing and believed it was all harmless activism.

Reiche's reliance on *United States v. Gardenhire*, 784 F.3d 1277 (9th Cir. 2015), to support her claim that she did not act recklessly is misplaced. In *Gardenhire*, the Ninth Circuit found that there was no evidence that a "bored" high school student who pointed a laser pointer at airplanes appreciated the risks of his conduct. *Id.* at 1278–79. Concluding that the episode was a "teenage prank," the Ninth Circuit observed that it was not self-evident that the defendant would have understood that "a laser beam can be distracting to pilots who are both enclosed in a cockpit and at least 2,640 feet away." *Id.* at 1281, 1285. Here, by contrast, Reiche is an adult, and it is simple common sense that sabotaging the signal system for freight trains carries risks. Moreover, the defendant in *Gardenhire* readily admitted his actions to the FBI, *id.* at 1279, suggesting that he did not appreciate why it was a problem, while Reiche repeatedly lied to sheriff's deputies about what she was doing. Still more, in *Gardenhire* the defendant's conduct had only recently become criminal, and the Ninth Circuit doubted that "six weeks after the effective date of 18 U.S.C. § 39A, 'Aiming a laser pointer at an aircraft,' the dangers of shining a laser at an aircraft were of general knowledge to the average person, or of specific knowledge to teens." *Id.* at 1283. The statute that Reiche violated has been on the books for many years. For all these reasons and more, *Gardenhire* is easily distinguishable.

The Court should find that Reiche acted recklessly and that the base offense level is therefore 18.

### 2. Acceptance of Responsibility

Reiche next argues that she is entitled to a two-level reduction of the offense level for acceptance of responsibility. She claims in her statement to the Court that she went to trial because she believed shunting was "safe and peaceful," and she found the charge against her

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"shock[ing]" and "extravagant." At trial, however, she says she was "mortified" by what she learned about the dangers of shunting, and she now "sincerely and deeply regret[s] [her] actions." These sentiments, while encouraging to the extent that they suggest she will not reoffend, do not qualify Reiche for the two-level reduction.

The Guidelines award the two-level reduction of the offense level to defendants who "clearly demonstrate[] acceptance of responsibility for [their] offense." USSG § 3E1.1(a). The reduction is a "reward" for "defendants who are genuinely contrite," *United States v. McKinney*, 15 F.3d 849, 853 (9th Cir. 1994), rather than, as Reiche claims, a penalty for going to trial. According to the Guidelines, a defendant can demonstrate satisfactory acceptance of responsibility by, for example, voluntarily surrendering before arrest, truthfully admitting her conduct in a timely manner after charging, or voluntarily paying restitution before conviction. USSG § 3E1.1(a) n. 1. The reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* at n.2. While defendants convicted at trial are not "automatically" barred from receiving the reduction, they will receive it only in "rare situations"—"for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id*. "In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pretrial statements and conduct." *Id*.

The record here is abundantly clear that Reiche does not qualify for the acceptance-of-responsibility reduction. She went to trial and vigorously contested her factual guilt, and only afterwards expressed remorse. She claims that she did not understand why her conduct was a problem and needed to see the government's evidence at trial to understand it better, but even if that were true (and—as noted above—there are aspects of her statement about her state of mind that defy the evidence) she could have educated herself about the dangers of shunting at any point before trial. Failing that, she could have pleaded guilty during trial the moment she came to appreciate the mortifying nature of her offense. Instead of taking any of
GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

these steps or expressing contrition in any other way, she tried to suppress all the key evidence against her before trial, and when that effort failed, she saw the trial through to the end, with her counsel claiming in closing argument, among other things, that she was merely out for a walk when the deputies stopped her, that her lies to the deputies were "lighthearted jokes," and that she "found" the bag with the wire, drill, and other tools. Tr. 235:20, 238:12. To deny guilt in this manner is not consistent with acceptance of responsibility under the Guidelines, and it makes Reiche's post-trial statement too little and too late. *Cf. United States v. Rojas-Flores*, 384 F.3d 775, 780 (9th Cir. 2004) (finding defendant entitled to credit for acceptance of responsibility where he went to a bench trial to make "a purely legal defense" concerning the meaning of the statutory term "weapon"). The Court should find that Reiche's post-trial statement does not establish the sort of genuine contrition that qualifies her for the two-level reduction.

### 3. Advisory Range

With a total offense level of 18, and because Reiche is in criminal history category I, PSR ¶ 29, the Guidelines advisory range is 27 to 33 months.

## II. Recommended Sentence

### A. Imprisonment

The government recommends that the Court sentence Reiche to 27 months of imprisonment. This custodial term, at the low end of the Guidelines range, would account for two sentencing factors of overriding importance in this case: the seriousness of the offense and general deterrence. 18 U.S.C. § 3553(a)(2)(A), (B).

First, the offense here was exceptionally serious. Derailments are a real risk, and when they happen, the consequences are devastating. There have been at least two examples just within the past year that hit close to home. In one, an oil train derailed near Custer, Washington, causing massive fires and other damage,[3] and in the other, a passenger train

---

[3] *See* https://www.seattletimes.com/seattle-news/train-carrying-crude-oil-derails-near-custer-whatcom-county.

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

bound for Seattle derailed in Montana, killing three people and injuring dozens.[4] Here, if a train had derailed where Reiche placed the shunt, numerous nearby homes and the train crew would have been badly affected. And even setting aside the risk of a derailment, the shunt endangered anyone crossing the tracks at Cliffside Drive. There might have been no warning from the crossing system at all.

Second, there is a need to deter others from committing a similar offense. Shunting became a significant problem last year in Western Washington, and if these incidents were to continue, it would only be a matter of time before the more serious possible consequences materialized. It is hard enough to accept when a derailment happens by chance or mistake; for one to be caused by deliberate misconduct would be beyond the pale. Imposing a Guidelines sentence would send a strong message that this exceptionally dangerous conduct is wholly unacceptable.

To be sure, there are mitigating factors present that favor Reiche, including her lack of criminal history, but all those factors are already incorporated into the calculation of the Guidelines range. Moreover, as a matter of relative culpability, the co-defendant, Brooks, has said that Reiche directed this offense, *see* PSR ¶ 9, and that claim squares with the available evidence. The trial record established that Reiche drove the two of them to the tracks that night, and Reiche held the wire and other equipment. At bottom, then, there is no basis to depart from the Guidelines range, and a term at the low end appropriately accounts for the important Section 3553(a) factors at stake.

**B. Supervised Release**

The government joins the Probation Office in recommending that the Court impose three years of supervised release. The government supports the conditions of supervision proposed by Probation, including the community service. This term of supervised release

---

[4] *See* https://www.seattletimes.com/nation-world/amtrak-cross-country-train-derails-near-town-in-montana.

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

will help ensure that Reiche moves her life in a positive direction after this extremely troubling offense.

### III.    Conclusion

The Court should sentence Reiche to 27 months in prison and three years of supervised release.

Dated:  December 10, 2021.              Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

/s/  Philip Kopczynski
PHILIP KOPCZYNSKI
SOK JIANG
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone:  206-553-7970
Fax:  206-553-4073
philip.kopczynski@usdoj.gov
sok.jiang@usdoj.gov

GOV'T SENT. MEMO
*United States v. Reiche*, CR20-215 RSM - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970